J-S20045-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: D.M.W., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: D.M.G. | No. 1667 WDA 2015 |

Appeal from the Order Dated October 8, 2015
in the Court of Common Pleas of Allegheny County
Civil Division at No.: TPR No. CP-02-AP-000020-2015

BEFORE: PANELLA, J., OLSON, J., and PLATT, J.[*]

MEMORANDUM BY PLATT, J.:                    **FILED MAY 3, 2016**

D.M.G. (Father) appeals the order, entered in the Court of Common Pleas of Allegheny County (trial court), on October 8, 2015, that terminated his parental rights to his son, D.M.W. (Child), born in April of 2013. We affirm.[1]

The Allegheny County Office of Children, Youth, and Families (CYF) obtained an emergency custody authorization for Child and his four older siblings on August 21, 2013, when Mother was involuntarily committed for severe mental health problems. There had been twelve prior referrals of this

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] The trial court also terminated the parental rights to Child of M.K.W. (Mother). Mother did not appeal that termination.

family to CYF from June of 2009 through June of 2013, when police reported domestic violence calls to the home during Mother's pregnancy with Child. At the time CYF removed Child, there was a court order in effect that barred Father from any contact with Mother. The trial court entered the order after Father pleaded guilty to aggravated assault for attacking Mother with a club on February 1, 2013, two months prior to Child's birth.

Father met Child for first time at the shelter care hearing on August 28, 2013, where the trial court scheduled weekly, supervised visits. The trial court adjudicated Child dependent on January 29, 2014, continued the visitation schedule, and ordered Father to attend the Arsenal Parenting Program.

Over the next few months, CYF reduced the supervision of Father's visits to "pop in and out" supervision and then to unsupervised, but still in the CYF office. Visits eventually moved to Father's home on Saturdays for four hours, supervised and then reduced to only one hour of supervision. Father's visits returned to supervised, however, when the testimony of Terry O'Hara, Ph.D., raised doubts about Child's safety. Dr. O'Hara was concerned about Father's cannabis abuse, his conviction for aggravated assault against Mother, and his minimization of his role in, and responsibility for, that domestic violence.

At the adjudication hearing, the trial court ordered Father to: 1) undergo a mental health evaluation; 2) provide proof of mental health

treatment; 3) provide proof of completion of the program at the Domestic Abuse Counseling Center (DACC); and 4) attend the Men's program at the Women's Center and Shelter.

Father attended a twelve-week parenting program with Arsenal and signed all releases of information for the agency. Father underwent three mental health evaluations with Dr. O'Hara, including individual psychological and interactional evaluations. Dr. O'Hara remained concerned that Father did not disclose significant problems with his various counselors. He did not disclose his marijuana use, nor did he disclose the full extent of his history of domestic violence and his criminal conviction for aggravated assault.

Father attended approximately half of his mental health appointments and completed the Men's program on his second attempt. The Men's facilitator, Rhonda Fleming, noted the Father was consistently late. Father claimed he was one half hour late every week because of his visits with Child. (*See* N.T. Hearing, 8/18/15, at 113-14). The record, however, reveals that the Men's sessions took place on Friday evenings, while Father's visits with his son occurred first on Thursdays and then on Saturdays. The trial court deemed Father to have completed the Men's program in spite of his consistent tardiness, and excused Father from the DACC classes when it gave him credit for attending the Men's program. Father also completed the twelve-week Arsenal parenting program.

During his individual evaluation in April of 2014, Father disclosed to Dr. O'Hara that he smoked cannabis on a monthly basis. In November of 2014, the trial court ordered Father to continue random drug screens. He was to begin a treatment program with SHORES on December 4, 2014, but missed the appointment. (*See* N.T. Hearing, 6/30/15, at 148). He underwent a drug and alcohol evaluation with SHORES on January 16, 2015. CYF caseworker, Megan McAfee, however, testified at the June 30, 2015 termination hearing that Father had been unsuccessfully discharged from the SHORES program and that they had recommended a higher level of treatment for him. (*See id.* at 148-49). Dr. O'Hara testified that, at the time of his last evaluation with Father, in March 2015, nearly all of Father's drug screens had been positive for marijuana. (*See* N.T. Hearing, 8/04/15, at 35-36). Ms. McAfee testified regarding Father's marijuana use:

> He had stated that he had [smoked marijuana] since he was young, that it was something his parents introduced to him, and that it was something that was part of his culture.
>
> So he didn't feel that the [c]ourt could order him to partake in drug and alcohol treatment, as it was part of his culture, and I explained to him that it was illegal in the State of Pennsylvania, so he would need to comply.

(N.T. Hearing, 6/30/15, at 149).

In addition to the issues of his domestic violence and drug abuse, Father is alleged to have sexually abused Child's older sister, E.T. The trial court summarized the allegations of child sexual abuse against Father in its opinion of December 9, 2015:

By the time [the court] held [Child's] adjudicatory hearing, it was made known that E.T.[,] the daughter born from Mother's other relationship, the older sister of [Child], had alleged that Father had sexually assaulted her. Father had been a paramour to Mother while she had the four older siblings in her care, before the birth of [Child]. In 2011, a then four-year-old E.T. had alleged that she had been sexually assaulted by Father. (***See*** CYF Exhibit 3, Dr. O'Hara Psychological Evaluation Report, 4/08/14, at 3). E.T. was forensically evaluated to address the allegations after she stated that Father . . . "stuck his stick in my cat." (***Id.***). In June of 2013, E.T., then age six, made an additional disclosure in which she stated that Father . . . "beat me with a stick first and then he put it in me." (***Id.*** at 4). E.T. further explained that Father . . . put the stick in "my cooch," referring to her vagina. (***Id.*** at 4). In describing the event, E.T. said, "when I was sleeping, [Father] came upstairs and he was and . . . and I was awake . . . and after I woke up he was gone and I saw my pants off.'" (***Id.***). E.T. also stated that the event occurred in her bed in her mother's house and that Father . . . "touched me with a stick . . . the stick was pokey and it was . . . this long and he was pushing it in and it hurted. I feeled it and I woke up . . . pushed it so hard." (***Id.*** at 5). E.T. reported that the "stick" was located "in between my legs." (***Id.***).

Following E.T's June 2013 disclosure, the police investigated the allegations, and E.T. was forensically interviewed by the Child Advocacy Center at the Children's Hospital. Although Father . . . was never arrested, [the] [c]ourt found that Officer Anthony Cortazzo of the Baldwin Police, who was present during E.T.'s forensic interview, credibly testified at a previous permanency review hearing that E.T. was credible and consistent during her previous forensics, and that [Father] sexually assaulted E.T.

These disclosures also occurred while CYF had an open case. E.T. made the same disclosure to her Families United Caseworker, who, in response to E.T.'s disclosure, contacted ChildLine. At least as of February 2015, E.T. was currently engaged in counseling for the sexual abuse through Nolton Diagnostics. Dr. O'Hara diagnosed E.T. with Post-Traumatic Stress Disorder resulting from the sexual abuse. (***Id.*** at 12). . . .

(Trial Court Opinion, 12/09/15, at 2-3) (footnotes and some record citations omitted) (record citation formatting provided).

CYF filed its petitions to terminate Father's parental rights on January 22, 2015. The trial court held hearings on those petitions on June 30, 2015, August 4, 2015, August 18, 2015, and October 7, 2015. The trial court entered its orders terminating Father's parental rights, pursuant to 23 Pa.C.S.A. §§ 2511(a)(1), (2), (5), (8) and (b), on October 8, 2015. Father filed his notice of appeal and statement of errors complained of on appeal on October 22, 2015.

Father raises the following questions on appeal:

1. Whether the [t]rial [c]ourt abused its discretion and/or err [sic] as a matter of law by terminating Father's parental rights under Section 2511 (a)(1), (2), (5) and (8) where the court order issued February 13, 2015 and the OCYF court addendum declared that Father was in full compliance with his family service plan goals and had made full progress on his family service plan goals[?]

2. Whether the [t]rial [c]ourt abused its discretion and/or err [sic] as a matter of law by determining that termination of Father's parental rights would meet the needs and welfare of [Child] under Section 2511 (b), in spite of witness testimony to the contrary showing a strong bond between [F]ather and [Child?]

3. Whether the [t]rial [c]ourt abused its discretion and committed an error of law by admitting evidence regarding Father . . . allegedly abusing E.[T.] when the allegations were refuted by several unfounded ChildLine investigations and where no criminal charges were filed after a thorough police investigation of the matter[?]

(Father's Brief, at 7) (emphases omitted).[2]

Our standard of review is as follows:

In an appeal from an order terminating parental rights, our scope of review is comprehensive: we consider all the evidence presented as well as the trial court's factual findings and legal conclusions. However, our standard of review is narrow: we will reverse the trial court's order only if we conclude that the trial court abused its discretion, made an error of law, or lacked competent evidence to support its findings. The trial judge's decision is entitled to the same deference as a jury verdict.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Further, we have stated:

Where the hearing court's findings are supported by competent evidence of record, we must affirm the hearing court even though the record could support an opposite result.

We are bound by the findings of the trial court which have adequate support in the record so long as the findings do not evidence capricious disregard for competent and credible evidence. The trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence. Though we are not bound by the trial court's inferences and deductions, we may reject its conclusions only if they involve errors of law or are clearly unreasonable in light of the trial court's sustainable findings.

*In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citations omitted).

---

[2] In his concise statement of errors complained of on appeal, Father did not, as he does in his questions presented, complain of the fact that the trial court terminated his parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), and he has, therefore, waived that issue for our review. *See* Pa.R.A.P. 1925(b)(4)(vii); *Yates v. Yates*, 963 A.2d 535, 542 (Pa. Super. 2008).

The trial court terminated Father's parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(1), (2), (5), (8), and (b). In order to affirm the termination of parental rights, this Court need only agree with any one subsection of Section 2511(a). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004).

Requests to have a natural parent's parental rights terminated are governed by 23 Pa.C.S.A. § 2511, which provides, in pertinent part:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

It is well settled that a party seeking termination of a parent's rights bears the burden of proving the grounds to so do by "clear and convincing evidence," a standard which requires evidence that is "so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re T.F.*, 847 A.2d 738, 742 (Pa. Super. 2004) (citation omitted). Further:

> A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

*In the Interest of K.Z.S.*, 946 A.2d 753, 759 (Pa. Super. 2008) (citation omitted).

The Adoption Act does not make specific reference to an evaluation of the bond between parent and child but our case law requires the evaluation of any such bond. *See In re E.M.*, 620 A.2d 481, 485 (Pa. 1993). However, this Court has held that the trial court is not required by statute or precedent to order a formal bonding evaluation performed by an expert. *See In re K.K.R.-S*., 958 A.2d 529, 533 (Pa. Super. 2008).

We begin our analysis by noting that Father has waived his claim that the trial court erred or abused its discretion when it terminated his paternal rights pursuant to section (a)(2). In support of his claim that the trial court

erred when it terminated his parental right pursuant to section (a)(2), Father

states that he

> has never been incapacitated, abused, neglected nor refused to parent [Child]. To the contrary, once Father was notified of [Child's] existence and made contact with [CYF], he made clear his desire to parent [Child]. There have been no allegations made that he ever abused, neglected, or refused to parent [Child]. None.

(Father's Brief, at 17). This issue also is waived.

Pursuant to Pennsylvania Rule of Appellate Procedure 2119(a), the argument section of an appellate brief must contain "such discussion and citation of authorities as are deemed pertinent." Pa.R.A.P. 2119(a). "[A] failure to argue and to cite any authority supporting an argument constitutes a waiver of issues on appeal." *Chapman-Rolle v. Rolle*, 893 A.2d 770, 774 (Pa. Super. 2006) (citation omitted); *see also* Pa.R.A.P. 2119(a), 2101 ("[I]f [] defects [] in the brief . . . are substantial, the appeal or other matter may be quashed or dismissed.").

Here, Father's argument contains no citation to any legal authority and he makes no effort whatsoever to link the facts of his case to the law. In sum, Father makes no attempt to develop a coherent legal argument to support his conclusion that the trial court erred in terminating his parental rights and he has, therefore, waived that argument. *See Chapman-Rolle*, *supra* at 774; Pa.R.A.P. 2101, 2119(a). However, in spite of this waiver, we will analyze the record as it relates to Section (a)(2). The trial court found

four factors that constituted Father's continued incapacity, abuse, neglect or refusal to parent Child.

The first factor was drug use. In its opinion, the trial court stated, "But this [c]ourt cannot discount Father's choice to continue to use marijuana, despite this [c]ourt's order, despite it being a violation of his probation and despite the ramifications his usage would have on his ability to parent." (Trial Ct. Op., at 8). The trial court found that Father

> uses marijuana when he feels weak and was defensive about being "forced" to discontinue his usage. Indeed, this [c]ourt is already alarmed by Father's inability to take responsibility for his crimes or transgressions. That Father repeatedly chooses to use drugs forces this [c]ourt to question whether he can appropriately prioritize the needs of a very small child. Father continually refused to remedy this condition.

(*Id.* at 8-9) (record citation omitted).

The second area of concern for the trial court was Father's history of domestic violence. Father pled guilty to aggravated assault with a deadly weapon and recklessly endangering another person, charges that arose from an incident with Mother. As a result of this incident, the trial court issued a protection from abuse order against Father. As the trial court found, however, Father violated that order:

> Despite having a Protection From Abuse [(PFA)] order against him, it was evident that Father maintained contact with Mother. (*See* N.T. 6/30/15, at 116-18). The CYF caseworker happened to drive by Father walking with Mother in the North Side. Given Mother's vulnerability resulting from her significant and obvious mental health issues, Father's continual pursuit of Mother not only violated the PFA but also approaches a line somewhere near predatory. But again, it is clear that Father outwardly refuses to

take responsibility for his actions—actions that prevent him from parenting [Child]. Father continually refused to remedy the domestic violence condition.

(Trial Ct. Op., at 9) (record citation formatting provided).

The third issue of concern for the trial court was Father's mental health. Father refused to seek treatment for what Dr. O'Hara termed "a possible major mental illness." (N.T. Hearing, 8/04/15, at 79). Dr. O'Hara testified that it was difficult to get information from Father. (*See id.*) In his report, Dr. O'Hara relates that Father told him that he had been diagnosed in 2012 with either substance-induced psychosis or psychotic disorder. (*See* Dr. O'Hara Psychological Evaluation Report, 3/23/15, at 25). The trial court found, "It is clear that Father refuses or is unable to remedy this condition." (Trial Ct. Op., at 10).

The fourth issue of concern for the trial court was the issue of Father's sexual assault of E.T. Relying on *In re C.B.*, 861 A.2d 287 (Pa. Super. 2004), *appeal denied*, 871 A.2d 187 (Pa. 2005), the trial court noted, "visitation will not be denied or reduced unless it poses a grave threat. The grave threat standard is satisfied when the evidence clearly shows that a parent is unfit to associate with his or her children." (*Id.* (citing *In re C.B.*, *supra* at 293)) (internal quotation marks omitted). The trial court accepted as true the allegations that Father sexually assaulted Child's older sibling, E.T. We quote the trial court's conclusion that Father poses a grave threat to Child, with approval:

This [c]ourt found clear and convincing evidence that a grave threat exists to [Child] based on E.T's repeated and consistent allegations against Father [], his history of domestic violence, and his failure to engage in therapy to address E.T.'s allegations or to address his drug and alcohol issues. ***See In re C.B.***, [***supra*** at 293)] (holding that father posed a grave threat to his minor son, despite the fact that father was not convicted of the alleged sexual abuse of his *de facto* stepdaughter). A review of the findings this [c]ourt has made since this case's inception demonstrates the overwhelming evidence that Father [] poses a grave threat to [Child].

(***Id.*** at 11).

We conclude that the trial court did not err or abuse its discretion when it determined that Father poses a grave threat to Child. Our review of the record reveals that CYF presented sufficient, credible evidence to support the trial court's determination to terminate Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2). Therefore, even if not waived, Father's first issue would not merit relief.

In his second claim, Father argues that the trial court erred and abused its discretion when it terminated his parental rights pursuant to section (b). In support of that claim, Father urges us to revisit the evidence presented and reach a different conclusion. (***See*** Father's Brief, at 22-25). Father, however, does not articulate how the trial court may have erred or abused its discretion and he cites no case law to support his claim. Therefore, Father has waived this issue. ***See Champman-Rolle***, ***supra*** at 774; Pa.R.A.P. 2101, 2119(a). Moreover, our examination of the record reveals sufficient credible evidence to support the trial court's determination.

- 13 -

Dr. O'Hara stated in his report that Child is bonded to his foster parents and his four siblings and that it would be, "extremely psychologically detrimental" to Child if he were to be removed from them. (Dr. O'Hara Psychological Evaluation Report, 3/23/15, at 25). He conceded that Father exhibits some positive parenting skills and has a positive relationship with Child, but concluded, "the benefit of permanency for [Child] and the trust and security and stability that he would experience with [his foster parents] would outweigh the risk of detriment in losing his relationship with [Father]." (N.T. Hearing, 8/04/15, at 70).

The doctor also found that Child and his siblings have thrived in the care of their foster parents who have strong parenting skills. He observed that the foster parents are patient and use positive redirection and praise with Child and his siblings. Dr. O'Hara observed a secure attachment among Child, his siblings and the foster parents, and noted that the foster home provided a secure placement that, "greatly contrasts the instability, exposure to violence and chaos that they endured while residing with [M]other, [Father,] and [Child's siblings' father]. (Dr. O'Hara Psychological Evaluation Report, 3/23/15, at 25).

Also, Dr. O'Hara did not see the same level of attachment with Father as he saw with the foster parents. He noted that, despite repeated redirection on his part, Father continually addressed the doctor with statements and questions during the interactional portion of the evaluation,

rather than staying focused on Child. This occurred during the last two evaluations in September 2014 and March 2015. Dr. O'Hara concluded, "So I didn't have any evidence that this relationship is—that terminating this relationship would significantly detrimental to the children." (N.T. Hearing, 8/04/15, at 56).

Our review of the record in this matter reveals that it supports the trial court's determination to terminate Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(b). Therefore, Father's second claim would not merit relief.

Finally, in his third issue, Father complains that the trial court committed an error of law by admitting evidence regarding his alleged abuse of E.T. (**See** Father's Brief, at 26-27). We disagree and quote the trial court's analysis of this issue, with approval:

> The [c]ourt notes that Father raises the hearsay matter on appeal, but did not raise it at trial. Father's counsel did not object during the admission of Dr. O'Hara's forensic reports, nor did she object during the admission of the certified record of the dependency orders. (**See** N.T. Hearing, 10/07/15, at 37-38). Counsel did not object during the CYF caseworker's testimony regarding E.T.'s disclosures of abuse. (**See** N.T. Hearing, 6/30/15, at 45-46, 49-53). And counsel was silent during Dr. O'Hara's testimony as well. (**See** N.T. Hearing, 8/04/15, at 24-27). Even though [E.T.] did not testify during the TPR hearing, there was ample evidence to establish sexual assault. Because Father's counsel did not object to the admissibility of the testimony and other evidence, Father's true contention is whether this [c]ourt improperly weighed the evidence.
>
> Father argues that because he was not charged with the crime and because Childline investigations were categorized as "unfounded," then it would be erroneous of this [c]ourt to

determine that he committed the act. On the contrary, E.T. made specific, consistent, and repeated disclosures. The [c]ourt also heard evidence that the reason the police and Childline investigations ceased was because Mother refused to cooperate. Dr. O'Hara testified that he was "amazed" no charges had been filed against Father. (*Id.* at 27). In terms of admissibility, this [c]ourt opines Father did not make proper objections at trial. In terms of weight, this [c]ourt opines that its determination that Father committed sexual abuse toward E.T. was properly based on the evidence presented.

(Trial Ct. Op., at 12-13) (record citation formatting provided).

With our standard of review in mind, *see In re L.M.*, *supra* at 511, we have thoroughly reviewed the records, briefs, and the applicable law, and determined that the evidence presented is sufficient to support the trial court's order terminating Father's parental rights to Child.

Accordingly, we affirm the trial court's order, entered October 8, 2015, terminating Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2) and (b).

Order affirmed.

Judge Panella joins the Memorandum.

Judge Olson concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/3/2016