861 A.2d 287 (2004)
In the Interest of C.B. and A.L., Minors, Appellees
Appeal of W.L., Appellant.
Appeal of W.L., Natural Father of Minor Children, Appellant.
Appeal of C.B., Natural Mother of Minor Children, Appellant.
Superior Court of Pennsylvania.
Argued March 10, 2004.
Filed October 20, 2004.
*289 Lori M. Peters, Stroudsburg, for W.L.
Jennifer Harlacher, Stroudsburg, for C.B.
David J. Williamson, East Stroudsburg, for C.B. and A.L., minors.
Elizabeth B. Weeks, Stroudsburg, for Monroe County Children and Youth Services.
Before: BOWES, McCAFFERY and POPOVICH, JJ.
BOWES, J.:
¶ 1 W.L. ("Father") appeals from the juvenile court's August 13, 2003 order suspending visitation with his son, A.L.[1] He also appeals from the September 24, 2003 order in which the court found the *290 existence of aggravated circumstances which permitted the suspension of all reunification efforts for the family in this dependency proceeding. C.B. ("Mother") also appeals the September 24, 2003 order. We affirm.
¶ 2 The following history is pertinent. C.B.[2] was born on December 10, 1992. Her parents are Mother and a man who is not involved in this appeal. A.L. was born on December 7, 1996. His parents are Mother and Father. On January 24, 2003, the children were taken into protective custody due to deplorable living conditions and truancy. After a hearing on January 30, 2003, the children were adjudicated dependent and placed into the care and custody of Monroe County Children and Youth Services ("CYS"). Dawn Walker, the intake caseworker, testified on behalf of CYS at that hearing. According to her testimony, CYS's involvement with this family began in January 2001, when it received a referral based on A.L.'s poor hygiene and concerns about Father's abuse of alcohol. The agency made an announced visit, and the caseworker conducted a full assessment. An intermediate unit referral was made for A.L. due to developmental delay, and an appointment was made for Father to attend drug and alcohol counseling. C.B. lived with her grandmother at that time. In October 2001, the agency closed the case because the goals were met.
¶ 3 On December 23, 2002, CYS received a second referral based on reports that Father was intoxicated while caring for children, that deplorable living conditions existed at the family dwelling, and that the children were not attending school. At that time, C.B. was ten years old, and A.L. was six years old. Ms. Walker conducted an unannounced visit on January 23, 2003. When no one was home, she returned, again unannounced, the following day.
¶ 4 Father was at home alone with the children, caring for them while Mother was at work. Ms. Walker stated that "the home was in extreme deplorable conditions," and there were feces "smeared" all over the flooring in the kitchen, bathroom, living room, and shower. N.T. Dependency Hearing, 1/30/03, at 10. The home had an overpowering smell of urine and feces. "The children's bedroom had, approximately, a foot worth of debris and clutter" that constituted a fire hazard. Id. at 11. The bathroom had mold growing and rotting food was found on the stove and countertops of the kitchen. The children were unclean, having "a foul smell" and were in immediate need of hygienic care. Id. at 13. The children had not attended school since October 2002. Ms. Walker immediately took the children into custody, discovering that six-year-old A.L. was not toilet trained. The children were placed together in foster care.
¶ 5 Ms. Walker subsequently conducted a full interview with C.B. but was unable to complete one with A.L. because he communicated on the level of a two-year-old. During her interview, C.B. referred to Father as "daddy." She told Ms. Walker that she had been disciplined by being struck with a belt buckle and that Father had touched her underneath her clothing, "that it hurt, [and] that it happened many times." Id. at 20. When asked why it hurt, C.B. responded that Father placed his hands "inside of her." Id. The young girl also stated that she "was afraid" to tell Ms. Walker about the sexual contact because "it was a secret; and that her daddy had told her that it's a secret between him and her and that no one's to know[.]" Id. *291 at 21. When asked who her "daddy" was, C.B. responded with Father's full name. Id. Mother told Ms. Walker that she had no information about C.B.'s biological father. Id. at 19.
¶ 6 Ms. Walker immediately scheduled a visit with an abuse specialist, Dr. Andrea Taroli. Ms. Walker also was present. During that interview, C.B. "disclosed that her father ... had stuck his private in her butt." Id. at 25. In addition, C.B. "talked about ... her father forcing her to perform fellatio on him, that she had gagged." Id. Thereafter, Mother and Father were arrested.
¶ 7 At the January 30, 2003 dependency hearing, Dr. Taroli was qualified as an expert witness in the area of forensic pediatrics. She confirmed that C.B. described being anally raped by Father and being forced to perform fellatio on Father. C.B. told Dr. Taroli that "dad told her that she'd be grounded if she told anybody and that she wouldn't be allowed to play with A.L., or he'd take away the TV and she'd have to stay in her room." Id. at 62. The child was able to describe the physical manifestations of an erection and its subsequent characteristics during and after ejaculation and an adult sexual device that Father used occasionally during the sexual abuse. This sexual device was recovered by police while executing a search warrant at the home. Dr. Taroli's physical examination of C.B. revealed findings consistent with "repeated anal penetration" and attempted vaginal penetration. Id. at 67. Dr. Taroli diagnosed C.B. as a victim of sexual abuse. A.L. suffered from stunted physical growth and mental retardation, having the mental acuity of a two-year-old child.
¶ 8 Based on this evidence, after the January 30, 2003 dependency hearing, the trial court found by clear and convincing evidence that the children were dependent. At that time, the goal of the CYS family service plan was reunification. CYS immediately moved to amend its petition alleging the existence of aggravated circumstances under 42 Pa.C.S. § 6302(2),[3] thus allowing it to suspend efforts at reunification.
¶ 9 The hearing on this request occurred on April 30, 2003. Cynthia Weber, the children's permanent caseworker, indicated the following. As a result of the abuse, Mother had been charged with endangering the welfare of children and corruption of minors while Father was charged with endangering the welfare of children, corruption of minors, rape, statutory rape, involuntary deviate sexual intercourse, and three counts of aggravated indecent assault.[4] The children had been placed in the same foster home. C.B. attended counseling and was enrolled in fourth grade with special education services. A.L. was in individual counseling and was enrolled in day care, receiving developmental educational services.
¶ 10 Mother sent Ms. Weber a letter indicating that Mother was the victim of verbal and physical abuse by her mother, that she was incapable of caring for C.B., and also that she "doesn't believe the accusations, the allegations that [C.B.] is making against [Father]." N.T. Hearing, *292 4/30/03, at 11. Ms. Weber concluded that aggravated circumstances existed based on Father's sexual abuse of C.B., the deplorable living conditions in the home, neglect, and the children's failure to attend school.
¶ 11 Psychologist Judith T. Munoz performed an evaluation of C.B., determined that she was a victim of sexual abuse, and confirmed that C.B. referred to Father as her father. C.B. related the details of Father's abuse consistently with what she previously had told Dr. Taroli. C.B. also told Ms. Munoz that Mother knew about the abuse and told C.B. that she should stop having sexual relations. In addition, C.B. related to Ms. Munoz that Father took pictures of his penis and of incidents of sexual abuse and posted them on the internet. Ms. Munoz opined that C.B. is developmentally delayed with "an overall adaptive behavior composite of four years one month," "scores in daily living skills ... of about three years five months, [c]ommunication was five years eleven months, and socialization was two years eleven months." Id. at 32.
¶ 12 Psychologist Michelle Tavormina was C.B.'s sexual abuse therapist and was making inroads in helping C.B. cope with the abuse. C.B. lives with A.L. in the same foster home, and her foster parents received counseling from Ms. Tavormina on how to assist victims of sexual abuse. C.B. indicated to Ms. Tavormina that she "would like" her foster parents to become her "new mommy and daddy." Id. at 58. A representative of C.B.'s elementary school confirmed that C.B. remained enrolled in the fourth grade, after being absent from October through December 2002, and that she was receiving educational support services. Based on this evidence, on September 24, 2003, the court found that aggravated circumstances existed under 42 Pa.C.S. § 6302(2) and that CYS was relieved from making further reunification efforts with this family.
¶ 13 In the interim, on August 8, 2003, before the trial court suspended reunification efforts, Father filed a motion to compel visitation with A.L. at the jail where he was incarcerated. He stated that, although visits with A.L. had begun on June 30, 2003, he sought more frequent visitation. On August 12, 2003, the court held a hearing on that petition, where the following was established. A.L. started visiting Father in jail every other week at the end of June 2003. Prior to those visits, he did not engage in any inappropriate sexual behavior. After those visits, both his foster parents and his teacher reported that A.L. would display disturbing behavior, including placing his hands on his penis inside his pants and rubbing his penis until it was red and also placing his hands on his neck and face. A.L.'s day care provider testified about this behavior at the hearing and reported that A.L. consistently displayed it after visiting Father.
¶ 14 Ms. Weber acknowledged the existence of a "bond" between A.L. and Father, n.t. hearing, 8/12/03, at 12; nevertheless, based on A.L.'s behavior after the visits, Ms. Weber concluded, "I've seen many children that have been sexually abused or have been witnesses of sexual abuse, and I would say that [A.L.] meets that criteria." Id. at 13.
¶ 15 Since the April 30, 2003 hearing, Mother had pled guilty to endangering the welfare of a child, had begun work, and was permitted supervised visitation with the children. Ms. Weber noted that the children "are happy to see [Mother] when she visits with them," and Mother "acts appropriately" during those visits. Id. at 17. Even though Mother had been compliant with the agency's goals, CYS was requesting that visits with her be suspended to aid the children's stability. Ms. Weber *293 opined that for "the children to make more progress, continue to be stable in the foster home," visits with Mother should cease. Id. at 20.
¶ 16 Ms. Tavormina updated the court about therapy and testified that during one session, C.B. reported to Ms. Tavormina that A.L. was present when Father would rape and sodomize C.B. C.B. told Ms. Tavormina,
"My brother was in the room when daddy was hurting me. He was in the room. When I was on the couch and daddy was on top of me, [A.L.] didn't save me. I called him to save me. He didn't save me. He was supposed to save me. He saw what daddy did."
Id. at 28.
¶ 17 Ms. Tavormina also told the court that C.B. had not exhibited any inappropriate behavior in foster care for five months. Then, a week after her first visit with Mother, C.B. engaged in humping behavior with A.L. and other children in the foster home. C.B. also started rubbing her vagina after visits with Mother began. Ms. Tavormina expressed her "clinical opinion" that "the visits [with Mother were] obviously causing some type of disruption." Id. at 36. In addition, Ms. Tavormina expressed deep concern about a letter from Mother in which she vilified C.B. "in terms of being responsible for the abuse." Id. at 29. Finally, Ms. Tavormina concluded that Mother did not have skills necessary to properly parent C.B. and A.L. because they had been "so severely sexually abused in so many capacities" and to such "an extreme nature." Id. at 37.
¶ 18 Cheryl Calandrino, the children's foster mother, confirmed that prior to June 2003, when the children started to visit Father and Mother, they behaved well and were appropriate with each other and other people in the household. After the first visit with Mother, A.L.'s demeanor did not change, but C.B. started to act inappropriately. A.L. started to place his hands on his penis after his first visit with Father.[5] Based on this evidence, on August 13, 2003, the court suspended all visits between Father and A.L.
¶ 19 Presently before this Court are Father's appeal from the August 13, 2003 order suspending visitation with A.L., and both parents' separate appeals from the September 24, 2003 order finding the existence of aggravated circumstances and suspending reunification efforts.

Appeal Number 2754 EDA 2003
¶ 20 This is Father's appeal from the August 13, 2003 order suspending visits between him and A.L. He raises one issue for our review:
Did the Juvenile Court, Dependency Division, err by suspending visits between natural father and his son, where [CYS] failed to show by clear and convincing evidence that the visits between father and son constitute a grave threat?
Appellant's brief at 5.
¶ 21 In a dependency case,
The standard against which visitation is measured ... depends upon the goal mandated in the family service plan. Where ... reunification still remains the goal of the family service plan, visitation will not be denied or reduced unless it poses a grave threat. If ... the goal is no longer reunification of the family, then visitation may be limited or denied if it is in the best interests of the child or children.
In re B.G., 774 A.2d 757, 760 (Pa.Super.2001) (quoting In re C.J., 729 *294 A.2d 89, 95 (Pa.Super.1999)). The "grave threat" standard is met when "the evidence clearly shows that a parent is unfit to associate with his or her children;" the parent can then be denied the right to see them. In re C.J., supra at 95. This standard is satisfied when the parent demonstrates a severe mental or moral deficiency that constitutes a grave threat to the child. See id.
¶ 22 Since the family reunification plan was intact when visitation was suspended, the trial court utilized the higher, more difficult standard, whether visitation posed a grave threat to A.L. Trial Court Opinion, 10/28/03, at 6. The trial court concluded that visitation between A.L. and Father posed a grave threat to A.L. Even though the sexual abuse charges were dismissed, the trial court found by clear and convincing evidence that Father sexually abused C.B. Based on the violent nature of the conduct, the trial court determined that Green v. Sneeringer, 431 Pa.Super. 66, 635 A.2d 1074 (1993), was applicable. In Green, the appellant-father sought visitation with his child after his conviction for the first degree murder of the child's mother. This Court concluded that the murder conviction alone was evidence that the appellant possessed a moral deficiency constituting a grave threat to the child. In the instant case, the trial court determined, likewise, that the evidence of Father's sexual abuse of C.B. was so heinous and repugnant that Green was applicable.
¶ 23 We agree with the trial court. Father has displayed such severe moral deficiency that he constitutes a grave threat to A.L. Regardless of whether his conduct resulted in criminal convictions, numerous CYS witnesses attested to the horrific sexual abuse perpetrated by Father on a ten-year-old girl in his care and custody. We view as entirely irrelevant the fact that this girl, who clearly viewed him as her father, was not actually Father's biological child. Father raped and sodomized this girl in front of A.L., who exhibited inappropriate sexual acting out after visiting Father in prison. We wholeheartedly concur with the trial court that in light of Father's clearly established moral depravity, he poses a threat to A.L. Hence, we affirm the suspension of visitation between him and A.L.

Appeal Number 3007 EDA 2003 and Appeal Number 3157 EDA 2003
¶ 24 These appeals are Father's and Mother's separate appeals from the September 24, 2003 order finding the existence of aggravated circumstances and suspending reunification efforts. Initially, we examine the relevant scope and standard of review:
In dependency proceedings our scope of review is broad. Nevertheless, we will accept those factual findings of the trial court that are supported by the record because the trial judge is in the best position to observe the witnesses and evaluate their credibility. We accord great weight to the trial judge's credibility determinations. Although bound by the facts, we are not bound by the trial court's inferences, deductions, and conclusions therefrom; we must exercise our independent judgment in reviewing the court's determination, as opposed to its findings of fact, and must order whatever right and justice dictate.
In re M.W., 842 A.2d 425, 428 (Pa.Super.2004) (quoting In the Interest of S.B., 833 A.2d 1116 (Pa.Super.2003)).
¶ 25 At issue in this case are the provisions of the newly-enacted revisions to Pennsylvania's Juvenile Act. A short examination of the history and purpose of these revisions is important to our resolution of these matters.
*295 ¶ 26 Due to the requirements of the federal Adoption and Safe Families Act ("ASFA"), enacted in 1997, and to obtain vital federal funding, the legislature amended the Pennsylvania Juvenile Act, 42 Pa.C.S. §§ 6301-6365. See In re Adoption of A.M.B., 812 A.2d 659 (Pa.Super.2002). The significance of these changes to the law cannot be overstated because the focus in dependency proceedings can be shifted under certain circumstances. Essentially, the ASFA directs the emphasis away from the paramount importance previously enjoyed by parental rights to establish "unequivocally that the goals for children in the child welfare system are safety, permanency and well-being." In re R.T., 778 A.2d 670, 678 (Pa.Super.2001) (quoting In Interest of Lilley, 719 A.2d 327, 334 n. 5 (Pa.Super.1998) (emphasis in original)); see 42 U.S.C. § 671. "The amendments make clear that the health and safety of the child supercede all other considerations." In re R.T., supra at 678 (quoting Lilley, supra at 333).
¶ 27 The legislative history of ASFA reveals that this act was designed to curb an inappropriate focus on protecting the rights of parents when there is a risk of subjecting children to long term foster care or returning them to abusive families. See In re J.I.R., 808 A.2d 934, 939 n. 5 (Pa.Super.2002) (examining House Report No. 105-77, April 28, 1997, Cong. Record Vol. 143 (1997), "Purpose and Scope," Page 8). ASFA's purpose is to eliminate the need for family reunification efforts when it is established that the children were exposed to sexual or physical abuse. Id.
¶ 28 With this background in mind, we now review the impact of the provisions of the Juvenile Act on this case. Family reunification efforts ended in this proceeding based on the existence of this aggravated circumstance: "(2) The child or another child of the parent has been the victim of physical abuse resulting in serious bodily injury, sexual violence or aggravated physical neglect by the parent." 42 Pa.C.S. § 6302. The juvenile court herein concluded that CYS presented clear and convincing evidence that C.B. was the victim of sexual violence by Father, her parent, justifying the elimination of family reunification efforts.
¶ 29 The first question we address is whether the juvenile court erred in applying the definition of "parent" to Father, who was not C.B.'s biological parent. Both Mother and Father raise this question. We conclude that under the circumstances of this case, Father properly was determined to be C.B.'s parent, as envisioned by 42 Pa.C.S. § 6302(2). The following facts are relevant to this determination. First, Father and Mother lived together and had a biological child together. C.B. resided with them for eighteen months prior to being removed. She lived with her maternal grandmother and then with Father and Mother. Father himself assumed the responsibility of caring for C.B. and A.L. on a daily basis while Mother was at work. He told authorities that he was home schooling C.B. Father was the only father figure in her life. C.B.'s biological father was unknown to her. Indeed, Mother could not even provide the biological father's birth date and had no information about his whereabouts. In addition, C.B. never labeled Father as her stepfather; instead, all the witnesses confirmed that C.B. consistently referred to him as daddy. There was, in fact, evidence that when one interviewer referenced Father as C.B.'s stepfather, C.B. corrected the interviewer and stated that he was her daddy.
*296 ¶ 30 The following must be established to support a conclusion that the legal status of in loco parentis exists:
The phrase "in loco parentis" refers to a person who puts oneself in the situation of a lawful parent by assuming the obligations incident to the parental relationship without going through the formality of a legal adoption. The status of in loco parentis embodies two ideas; first, the assumption of a parental status, and, second, the discharge of parental duties. The rights and liabilities arising out of an in loco parentis relationship are, as the words imply, exactly the same as between parent and child. The third party in this type of relationship, however, can not place himself in loco parentis in defiance of the parents' wishes and the parent/child relationship.
T.B. v. L.R.M., 567 Pa. 222, 228-29, 786 A.2d 913, 916-17 (2001) (citations omitted). The doctrine is applied "where the child has established strong psychological bonds with a person who, although not a biological parent, has lived with the child and provided care, nurture, and affection, assuming in the child's eye a stature like that of a parent." Id. at 230, 786 A.2d at 917. Another important aspect of this doctrine is "whether the third party lived with the child and the natural parent in a family setting, irrespective of its traditional or nontraditional composition, and developed a relationship with the child as a result of the participation and acquiescence of the natural parent." Bupp v. Bupp, 718 A.2d 1278, 1281 (Pa.Super.1998).
¶ 31 The present facts satisfy all aspects of the doctrine. First, Father assumed parental status and discharged parental duties each day by caring for C.B. while Mother worked and by representing to school authorities he was teaching her. This relationship was sustained over one and one-half years, and there was no biological father to defy Father's assumption of that status. Father unquestionably assumed parental stature in C.B.'s eyes, and she psychologically strongly viewed him as her father. Finally, Father lived with C.B. and her biological Mother in a family setting, and Mother acquiesced in the development of the parental bond between Father and C.B. See T.B. v. L.R.M., supra (female in homosexual relationship with another female obtained in loco parentis status as to biological child of her partner); Bupp, supra (mother's live-in paramour acquired in loco parentis status by having assumed and discharged parental duties with the consent of the biological mother even though parties cohabitated for only one year). Therefore, we consider Father a parent to C.B. under 42 Pa.C.S. § 6302(2), irrespective of the absence of any biological or adoptive bond.
¶ 32 We must analyze the significance of In re Davis, 502 Pa. 110, 465 A.2d 614 (1983), to our holding. Davis was authored by Justice Rolf Larsen. Only one other justice, Justice Roberts, joined in that case. The other justices concurred in the result. One of the questions presented in that case involved the definition of "parent" for purposes of determining whether a child was a "dependent child," as envisioned by the Juvenile Act, which contains no definition of parent. The context of that inquiry revolved around the question of whether a child, Shane, was dependent because he was without a "parent." Shane' mother had been abandoned by her biological parents as a child and raised by a couple who never adopted her. That couple also helped raise Shane, whose biological father was unknown. Shane's mother died, and the question was whether Shane was without "a parent, guardian, or legal custodian," for purposes of 42 Pa.C.S. § 9302's definition of "dependent child" so that the local child welfare agency could become involved in his care. The Supreme *297 Court ruled that the doctrine of in loco parentis would not be used to determine whether a person was a parent, legal guardian, or legal custodian for purposes of determining whether a child was a dependent child and that a person who was not a biological or adoptive parent was not a parent.
¶ 33 Davis is a nonprecedential decision,[6] and it is relied upon heavily by Father and Mother. Regardless of its precedential power, Davis stands for the sound proposition that the doctrine of in loco parentis should not be employed when determining whether a child has a parent for purposes of determining whether the child is dependent and thus, whether agency involvement should be initiated. However, the thrust of Davis supports the more fundamental precept that the Juvenile Act should be interpreted to accord the most protection to children. Clearly, the result in Davis was to enable the local child welfare agency to intervene and to ensure that the child was safe. Thus, Davis stands for the essential proposition that the Juvenile Act should be construed so as to afford the maximum opportunity to safeguard children.
¶ 34 Herein, we analyze a different provision of the Juvenile Act and conclude that for purposes of defining "parent" in the context of "aggravated circumstances," the doctrine of in loco parentis is appropriately applied. Actually, Davis is conceptually compatible with our holding, which also is motivated solely by the desire to interpret each provision of the Juvenile Act in the manner which best serves the protection of children.
¶ 35 Importantly, our finding that Father is a parent within the meaning of § 6302(2) strikes at the central purpose of ASFA, which is to remove children from an abusive home environment. The abuse was perpetrated in C.B.'s home. C.B. had no other father but Father; he was the biological father of her brother. Mother allowed Father to assume parental status by committing both her children to his care daily while she worked. In C.B.'s home, Father was the perpetrator of horrific and sustained sexual abuse against this ten year-old girl. Father allowed his biological son to witness this abuse. If we are to heed the mandate of the federal and state legislature that directs us to focus on the safety and well-being of children, we cannot reach any other conclusion but that Father was a parent for purposes of 42 Pa.C.S. § 6302(2) in this case.
¶ 36 Father also maintains that the evidence regarding the sexual abuse was speculative and did not comply with the necessary standard of clear and convincing evidence. He contends that the allegations were "unsupported by solid and conclusive evidence." Father's brief at 10. We strongly disagree. The evidence of sexual abuse was substantiated by a forensic pediatrician after physical examination, two psychologists, and two caseworkers. All five witnesses opined that C.B. was the victim of repeated sexual abuse by Appellant and rebuked any efforts to cast doubt on the credibility of C.B.'s accusations. The foster mother and A.L.'s day care provider confirmed that A.L. and C.B. exhibited behavioral manifestations consistent with abuse victims.
¶ 37 Contrary to Father's assertion that C.B.'s physical examination was inconclusive, Dr. Taroli testified, "The examination finding of the abnormal anal tone and immediate dilation of the anus with separation *298 of the buttocks is abnormal; and consistent with and most often seen with repeated anal penetration." N.T. Dependency Hearing, 1/30/03, at 66-67. Ms. Walker, the intake caseworker, acknowledged the existence of C.B.'s memory difficulties, which are emphasized by Father in his brief. Nevertheless, Ms. Walker unequivocally testified that she did not believe that C.B. had any difficulty discerning the difference between truth and fiction and did not consider C.B.'s reports to be inaccurate. Id. at 31. C.B. was consistent about the existence and type of abuse to both caseworkers, Dr. Taroli, and two psychologists. None of these professionals doubted this child. Her humping and the rubbing of her vagina, which were observed by her caretakers, were described by expert witnesses as behavior consistent with victims of sexual abuse. Witness after witness at each of the three hearings conducted in this proceeding provided vast amounts of evidence on this question. We agree with the trial court that the evidence in this case was clear and convincing; indeed, it was overwhelming. We reject Father's assertion that the evidence was insufficient to support the finding of child abuse and likewise reject Mother's related assertion that an abuse of discretion was present in this case.
¶ 38 In addition, Mother's professed lack of notice of the sexual abuse is beyond belief and highlights the tragic circumstances in which these children lived. C.B. informed her therapist that Mother was aware of the abuse. However, rather than make any attempt to stop Father from sexually abusing the child, Mother told C.B. that she should not engage in sexual activity with Father. N.T., 4/30/03, at 26-29. In a letter to CYS, Mother accused C.B. of lying about the abuse, and then, once faced with irrefutable proof of the facts, Mother blamed the ten-year-old girl as being responsible for the sexual abuse.
¶ 39 Mother avers that we cannot rely on the hearsay statement C.B. made to her therapist. However, C.B.'s statement was supported by the fact that C.B., who had engaged in no sexually inappropriate behavior beforehand, started to rub her vagina and hump other children after her first visit with Mother. We do not hesitate to conclude that Mother knew what was happening to her daughter.
¶ 40 ASFA's purpose is to eliminate the need for family reunification efforts when it is established that children were exposed to sexual or physical abuse. These parents have exhibited no responsibilities attendant with parenting but have been abusive and grossly neglectful; thus, we direct our focus away from any parental "rights" and toward the protection of these innocent, scarred children, who have been subjected to egregious horrors that shake the very foundations of the precious family institution. We affirm the decision of the trial court to suspend reunification efforts in this dependency proceeding.
¶ 41 Orders affirmed.
NOTES
[1] This order is a final, appealable order. In the Interest of H.S.W.C.-B & S.E.C.-B., 575 Pa. 473, 836 A.2d 908 (2003).
[2] Since Mother has the same initials as C.B., we refer to Mother as such throughout this decision. For consistency, we refer to Father similarly.
[3] That section provides:

Aggravated circumstances. Any of the following circumstances:
....
(2) The child or another child of the parent has been the victim of physical abuse resulting in serious bodily injury, sexual violence or aggravated physical neglect by the parent.
[4] Father represents that on October 21, 2003, he pleaded guilty to child endangerment and corruption of minors; the rape and related sexual assault charges were dismissed.
[5] We observe that no evidence was presented that A.L. was the victim of sexual abuse; however, testimony was presented that he witnessed C.B.'s abuse.
[6] In Commonwealth v. Price, 543 Pa. 403, 672 A.2d 280 (1996), the Court observed that a decision that does not command a majority of the votes is a non-precedential plurality decision.