J-S78041-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF G.S., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: W.S., FATHER | |
| | No. 824 WDA 2016 |

Appeal from the Order May 12, 2016
in the Court of Common Pleas of Erie County Domestic Relations
at No(s): No. 189 of 2015

BEFORE: BENDER, P.J.E., OTT, J., and FITZGERALD,[*] J.

MEMORANDUM BY FITZGERALD, J.:          **FILED DECEMBER 19, 2016**

W.S. ("Father") appeals from the order of the Erie County Court of Common Pleas that directed the Office of Children and Youth ("OCY") to discontinue services and visitation regarding his dependent, non-biological child, G.S. ("Child").[1] Father claims the trial court erred when it suspended services and visitation pending the results of a paternity test and found the concurrent permanency goals of reunification and adoption were no longer feasible. We affirm.

On August 6, 2015, OCY obtained an emergency protective order to ensure Child's safety after Child's mother ("Mother") was admitted to a hospital for a report of chest pain. Child was with Mother at the time, and they were homeless. OCY learned of Mother's mental health problems, history of substance abuse, unstable housing, and lack of necessities for

---

[*] Former Justice specially assigned to the Superior Court.

[1] Child was born in June of 2012.

Child. Father was not known to OCY at the time and Mother refused to cooperate with OCY. Child was placed in the legal and physical custody of OCY.

OCY filed a dependency petition on August 10, 2015, which listed Mother as the only parent. On August 14, 2015, OCY amended its petition to include Father. As to Father, OCY alleged he was not an active caregiver for Child, might not be Child's biological parent, and was the subject of a protection from abuse ("PFA") order for multiple domestic violence incidents against Mother. At least one of the domestic violence incidents occurred in the presence of Child.[2]

At an August 18, 2015 adjudication hearing before a master, the parties agreed to amend the dependency petition to reflect that Father and Mother married in May of 2012—approximately one month before Child's birth—and Father participated in the upbringing of Child until he and Mother separated in April of 2015. At the hearing, Mother asserted Child's biological father was E.A. OCY requested paternity testing, but Father objected based on estoppel. The master concluded paternity testing was not required at that time and found Child dependent. The trial court adopted the master's recommendations on August 21, 2015.

---

[2] Father later acknowledged that Child was present when he punched Mother in the head multiple times after Mother blamed him for damage to the car. ***See*** Addendum to Psychological Evaluation, 12/10/15, at 5.

Following a permanency review hearing on September 16, 2015, the trial court entered a dispositional order on September 22, 2015. The court indicated the current placement goal for Child was "return to parent or guardian." Order, 9/22/15, at 2. The court ordered Father to (1) cooperate with OCY, (2) attend and complete a domestic violence/anger management program, (3) provide for the health and safety of Child during visitation, (4) alternate attendance at Child's medical appointments with Child's mother, and (5) demonstrate an understanding of the information provided by healthcare professionals.[3] *Id.* The court directed Father to undergo a psychological assessment. *Id.*

On December 16, 2015, the trial court convened a permanency review hearing. OCY called Dr. Peter von Korff to testify regarding his psychological evaluations of Father. According to Dr. von Korff, Father exhibited a schizotypal personality disorder that affected his ability to care for Child[4] and

---

[3] We note that there was an issue regarding Mother and Father's consent to vaccinate Child. Mother was willing to have some vaccinations administered. Father asserted a religious belief arguing Child was not an "animal."

[4] Specifically, Dr. von Korrf opined:

> The present assessment indicates that [Father] has a number of deficits that draw into question his ability to function as an independent caregiver to [Child]. From a diagnostic perspective he would appear to present with chronic personality and socialization problems that best fit the pattern of Schizotypal Personality Disorder. From an attachment perspective he presents with a preoccupied state of mind, so that despite his valuing of relationships

- 3 -

would need an anger management program, as well as years of individual mental health treatment, before he could safely parent Child.[5] ***See*** N.T. 12/16/15, at 19-21. The doctor noted that Father did not acknowledge having mental health issues or a need for treatment. ***Id.*** at 11.

Mother maintained that E.A. was Child's biological father. ***Id.*** at 70. Mother acknowledged that in November 2015, one month before the hearing, she attempted to reconcile with Father and withdraw or amend the PFA to permit them to seek counseling. ***Id.*** at 71-72. She testified she and Father had at least one counseling session, but she did "not intend to stay

---

> he is unprepared at this point in time to develop secure attachments with his significant others, including [Child]. . . .
>
> It is the writer's opinion that if [Father] were to resume a primary parental role with [Child] that he would need ongoing individual counseling and parent-child attachment oriented psychotherapy. . . . [Father] has a degree of extended family support, however his own interpersonal adjustment and parenting skills are currently insufficient for the task of managing [Child's] developmental requirements. . . .

Psychological Evaluation, 11/19/15, at 14.

[5] In an addendum report, Doctor Kroff asserted an additional interview with Father indicated "very significant problems" with anger management. Addendum to the Psychological Evaluation, 12/10/15, at 6. According to the doctor, Father "gave little thought to the impact of his behavior upon [Child]" when discussing the incidents of domestic abuse against Mother. ***Id.*** The doctor concluded that "the anger interview with [Father] raised serious concerns about his suitability as a primary caregiver for [Child]." ***Id.*** at 7.

married" to Father. *Id.* at 72. Mother asserted a PFA was not necessary. *Id.*

OCY's counsel informed the trial court that Father was excluded as Child's biological Father at a prior support proceeding, but was found to be Child's legal parent. *Id.* at 54. Father's counsel averred she was unaware of a prior paternity test. *Id.* at 82.

OCY requested the addition of a concurrent goal of adoption. OCY further requested Father receive no services. Father's counsel objected to the cessation of visitation.

On December 29, 2015, the trial court entered its permanency review order. The court permitted Father one supervised visit with Child and granted OCY's request to add the concurrent goal of adoption. The court did not order services for Father, but directed the parties to address whether a paternity test was performed and whether it was in Child's best interest to continue providing services to Father. *See* Order, 12/29/15, at 2-3.

At the permanency review hearing on February 1, 2016, the trial court indicated DNA testing confirmed that Father was not Child's biological parent. N.T., 2/1/16, at 3. OCY again requested cessation of services to Father, arguing that it did "not want to look at [Father] as a resource" because he was not a natural parent, he exposed Child to domestic violence, and he continued to have serious mental health issues that remained untreated. *Id.* at 5. OCY and Child's guardian *ad litem* asserted it would be

in Child's best interest to discontinue Father's visitation. *Id.* at 5, 9. Father's counsel requested a bonding assessment. *Id.* at 11-12. At the conclusion of the hearing, the trial court questioned Father. Father denied having mental health issues and requested a new mental health evaluation. *Id.* at 24, 26. The court denied the request for an independent mental health evaluation. *Id.* at 27.

The trial court entered its permanency review order on February 11, 2016. The court directed OCY to discontinue services to Father until a bonding assessment was completed. Order, 2/11/16, at 3. However, the goal of reunification concurrent with adoption remained unchanged. *See id.* at 1-2. The court indicated Father made "moderate progress" toward alleviating the circumstances necessitating placement. *Id.* at 1.

The trial court held a permanency review hearing on May 11, 2016.[6] Father was not present, but was represented by counsel. The court noted E.A. was determined to be the biological father of Child, but was not present for the hearing. N.T., 5/11/16, at 2. OCY asserted it was exploring kinship care out-of-state with E.A.'s family. *Id.* at 10. OCY requested to have

---

[6] The hearing was initially scheduled for April of 2016, but was continued on Father's counsel's request.

Father "removed from the case" and asserted it would pursue termination of his rights under 23 Pa.C.S. § 2511(a)(3).[7]

Dr. von Korff's bonding assessment was made part of the record of the May 11, 2016 hearing without objection or additional testimony from the doctor, who was present at the hearing.[8] *Id.* at 3.

In his report, Dr. von Korff opined:

> The assessment evidenced a tenuous and troubled attachment between [Father] and [Child]. Observations obtained in the office setting were consistent with an insecure attachment. [Child's] preference was for independent play. She used [Father] mainly as a facilitator, a companion, and admirer, and a provider. There was generally little eye contact and very little sense of developing shared ideas. His departure from the room and his subsequent return did nothing to alter [Child's] pattern of behavior. [Child] simply carried on with her independent play interests.
>
> A mixture of affectionate feeling, emotional strain and remoteness was observed. Examples of confusion and uncertainty in the emotional relationship included the contrast between [Child's] very slow warming to [Father] and her tearful request to go with him at the close of the meeting.
>
> A comparison between the video clips [of Father's interactions with Child before the adjudication of dependency] and the observed behavior in the session revealed a very noteworthy degradation of the father-

---

[7] Section 2511(a)(3) permits the termination of the rights of a parent on the grounds that "[t]he parent is the presumptive but not the natural father of the child." 23 Pa.C.S. § 2511(a)(3). OCY filed a petition to terminate Father's parental rights while this appeal was pending.

[8] Dr. von Korff was available for examination, but was not called to testify by any of the parties.

daughter relationship. It was clear that extended separation has had an obstructive impact on their way of being together. Remnants of a more affectionate relationship survive despite their being apart, but the quality of relaxed and joyful association observed in the videos was never present during the office visit.

The writer's observations suggested that a sub-optimal and insecure early attachment relationship between parent and child has been significantly degraded by their protracted separation. The examiner would urge that every effort be made to provide [Child] with attachment permanency as soon as possible.

Bonding Assessment, 3/23/16, at 7-8.

The trial court entered its permanency review order on May 12, 2016, indicating Father was noncompliant and made no progress in alleviating the problems that necessitated the original placement. Order, 5/12/16, at 1. The court discontinued OCY's services to Father. *Id.* at 2. Child's goal, however, remained reunification concurrent with adoption. *Id.* at 1-2.

On May 13, 2016, Father's counsel filed a motion to withdraw the May 12th order and reopen the record based on Father's nonattendance at the May 11th hearing. The court denied the motion. The court emphasized Dr. von Korff was available for examination at the May 11th hearing and the doctor's bonding assessment was made part of the record without objection.

On June 8, 2016, Father timely filed his notice of appeal and statement of errors complained of on appeal. The trial court filed a responsive opinion, suggesting that Father's procedural defaults precluded review, but also

indicating that it found Father was an inappropriate resource for placement planning based on Dr. von Korff's testimony.

Father presents the following questions for our review:

> Whether the [trial] court committed an abuse of discretion and/or error of law when it determined that services and/or visitation should cease between [Father] and [Child] following the permanency review hearing on December 16, 2015, pending the results of a paternity test for [Father].
>
> Whether the [trial court] committed an abuse of discretion and/or error of law when it determined that the concurrent permanency goal of reunification/adoption was no longer feasible, dispensed with the current goal of reunification after only nine (9) months and directed [OCY] to provide no further services to [Father] or provide visitation with [Child].

Father's Brief at 2 (some capitalization removed).[9]

Preliminarily, we must address whether we have jurisdiction over this appeal. *See Mensch v. Mensch*, 713 A.2d 690, 691 (Pa. Super. 1998). Both the trial court and OCY suggest that Father's appeal should be quashed because the appeal is either untimely or interlocutory. Specifically, they assert Father should have appealed the December 29, 2015 order adding the concurrent goal of adoption, and the May 12, 2016 order directing the

---

[9] OCY notes Father's Pa.R.A.P. 1925(b) statement included a claim that the trial court erred in refusing to reopen the May 11th hearing due to Father's nonattendance. Father's brief does not address this issue in any meaningful fashion. Accordingly, we conclude Father has abandoned any issue arising from his failure to appear at the May 11th hearing. *See In re W.H.*, 25 A.3d 330, 339 n.3 (Pa. Super. 2011).

cessation of services and visitation was interlocutory and not appealable.[10] We disagree.

It is well settled that jurisdictional issues, such as the appealability of an order, raise legal question over which our review is *de novo* and plenary, and which may be considered *sua sponte*. **See id.** This Court has held that an order suspending visitation is final and appealable. **See In re C.B.**, 861 A.2d 287, 289 n.1 (Pa. Super. 2004). Moreover, Pennsylvania courts hold that an order granting or denying a goal change, even if it maintains the *status quo*, is appealable. **See In re H.S.W.C.-B**, 836 A.2d 908, 909 (Pa. 2003); **In re C.M.**, 882 A.2d 507, 513 (Pa. Super. 2005).

Instantly, the December 29, 2015 order initially added a goal of adoption concurrent with reunification and permitted Father one supervised visit. However, the trial court scheduled a further permanency review, at which the parties were to address whether it was in Child's best interest for Father to receive services. Accordingly, the December 29th order was not a final determination that Father was an inappropriate resource for services and/or reunification.

In contrast, the May 12, 2016 order purported to end Father's services and visitation, even as the order maintained the concurrent goals of reunification and adoption. The May 12th order, in effect, determined Father

---

[10] OCY filed a separate motion in this Court to quash the appeal on the above-stated grounds.

was not a viable resource in the goal of reunification and granted OCY's request to "remove him" from the dependency proceedings while OCY took steps to terminate his parental rights. Accordingly, we deem the order of May 12, 2016 to be final and appealable. *In re H.S.W.C.-B*, 836 A.2d at 909; *In re C.M.*, 882 A.2d at 513; *In re C.B.*, 861 A.2d at 289 n.1.

Father first argues that it was not in Child's best interests to cease services and visitation and there was no indication he posed a grave threat to Child. He contends that he has held himself out as Child's father, Child knows and accepts him as her father, he was Child's legal father for the purposes of support, and Child and Father share a loving bond.[11] Father's Brief at 11-13. Second, Father argues that the trial court abused its discretion when it determined the permanency goal of reunification concurrent with adoption was "no longer feasible." *Id.* at 13. He claims that he was making progress toward achieving reunification and the court's finding, as memorialized in the May 12, 2016 order, that he was noncompliant and made no progress toward reunification lacked support in the record. *Id.* at 13. Father observes that OCY filed a petition to terminate

---

[11] We note that Father challenges the trial court's decision to "put on hold" his services and visitation in the December 16, 2015 permanency review hearing. Father's arguments with respect to the December 16, 2015 order are either waived due to his failure to timely appeal that order or meritless in light of the provisional nature of that order. However, given the practical effects of the May 12, 2016 permanency review order, we will consider the trial court's ruling to terminate Father's services and visitation.

his parental rights and requests that we direct the withdrawal of the petition.

*Id.* at 15.  We address these claims jointly.

The following standards govern our review:

> When reviewing [the trial] court's order in a case involving a minor child, we review for an abuse of discretion with a focus on the best interests of the child; an abuse of discretion "is more than just an error in judgment . . . [the trial court] will not be found to have abused its discretion unless the record discloses that the judgment exercised was manifestly unreasonable or the result of partiality, prejudice, bias, or ill-will."

*In re M.B.*, 869 A.2d 542, 546 (Pa. Super. 2005) (citation omitted).

> In dependency proceedings our scope of review is broad. Nevertheless, we will accept those factual findings of the trial court that are supported by the record because the trial judge is in the best position to observe the witnesses and evaluate their credibility.  We accord great weight to the trial judge's credibility determinations.  Although bound by the facts, we are not bound by the trial court's inferences, deductions, and conclusions therefrom; we must exercise our independent judgment in reviewing the court's determination, as opposed to its findings of fact, and must order whatever right and justice dictate.

*In re C.B.*, 861 A.2d at 294 (citation omitted).

This Court has noted:

> Placement of and custody issues pertaining to dependent children are controlled by the Juvenile Act,[ ] which was amended in 1998 to conform to the federal Adoption and Safe Families Act ("ASFA").[ ]  The policy underlying these statutes is to prevent children from languishing indefinitely in foster care, with its inherent lack of permanency, normalcy, and long-term parental commitment.  Consistent with this underlying policy, the 1998 amendments to the Juvenile Act, as required by the ASFA, place the focus of dependency proceedings, including change of goal proceedings, on the child.  Safety,

permanency, and well-being of the child must take precedence over **all** other considerations, including the rights of the parents.

At each review hearing for a dependent child who has been removed from the parental home, the court must consider the following, statutorily-mandated factors:

the continuing necessity for and appropriateness of the placement; the extent of compliance with the service plan developed for the child; the extent of progress made towards alleviating the circumstances which necessitated the original placement; the appropriateness and feasibility of the current placement goal for the child; and, a likely date by which the goal for the child might be achieved.

Matters of custody and placement for a dependent child must be decided under the standard of the child's best interests, not those of his or her parents.

When the child welfare agency has made reasonable efforts to return a foster child to his or her biological parent, but those efforts have failed, then the agency must redirect its efforts towards placing the child in an adoptive home. This Court has held that the placement process should be completed within 18 months. As this Court has stated previously,

Pennsylvania . . . [is] required to return the child to [his or her] home following foster placement, but failing to accomplish this due to the failure of the parent to benefit by . . . reasonable efforts, [the Commonwealth is then required] to move toward termination of parental rights and placement of the child through adoption. . . . [W]hen a child is placed in foster care, after reasonable efforts have been made to reestablish the biological relationship,[12] the

---

[12] The Juvenile Act traditionally focused on consanguinity or a formal legal relationship. *Cf. In re Davis*, 465 A.2d 614, 619 (Pa. 1983) (plurality) (noting "[t]here is no indication that the legislature intended 'parents' to include anything other than natural, blood relationship parents, and adoptive

needs and welfare of the child require [the child welfare agency] and foster care institutions to work toward termination of parental rights, placing the child with adoptive parents.

*In re N.C.*, 909 A.2d 818, 823-24 (Pa. Super. 2006) (citations omitted).

The record reveals that at the December 11, 2015 hearing, the trial court initially expressed concerns about providing services to Father because he was not a natural parent. However, the court found Dr. von Korff's psychological assessment of Father's mental health issues and his need for treatment credible. The court also determined that there was "not a strong bond between [Father] and [C]hild, and that [Father] needed a lengthy amount of time to stabilize his own behavior." *See* Trial Ct. Op., 7/18/16, at 19. The court concluded that Child "needed permanency and stability and, because of her young and vulnerable age, waiting for [Father] to stabilize

---

parents . . . ."); *Ellerbe v. Hooks*, 416 A.2d 512, 514-515 (Pa. 1980) (noting "the blood relationship of parenthood has traditionally served and continues to serve as our society's fundamental criterion for allocating control over and responsibility for our children . . . "). However, the doctrine of *in loco parentis* applies

> to a person who puts oneself in the situation of a lawful parent by assuming the obligations incident to the parental relationship without going through the formality of a legal adoption. The status of *in loco parentis* embodies two ideas; first, the assumption of a parental status, and, second, the discharge of parental duties. The rights and liabilities arising out of an *in loco parentis* relationship are, as the words imply, exactly the same as between parent and child.

*In re C.B.*, 861 A.2d at 296 (citation omitted).

and also create a meaningful bond with her was not in her best interest."

***Id.***

We find adequate support for the trial court's decision to cease services and visitation based on its findings that Father was not a viable resource in placement planning for Child. The court considered and found credible the record evidence that Father was unable to parent Child on his own and would not be able to do so without years of treatment. Mother no longer wished to reconcile with Father. Lastly, although Father made some progress to the goal of reunification by complying with visitation and undergoing a mental health evaluation, Father consistently denied the need for further mental health treatment.[13]

Moreover, although only nine months passed between Child's removal from Mother's custody and the trial court's May 2016 decision to stop services and visitation, the trial court appropriately focused on Child's best interests rather than Father's parental rights. ***See In re N.C.***, 909 A.2d at 823-24.

_____

[13] We note the trial court asserts Father waived any objection to its finding that he was noncompliant and failed to make progress. **See** Trial Ct. Op. at 17. At the May 11, 2016, hearing the trial court summarized OCY's request to terminate services as follows: "But for the purposes of dependency, your argument is that it's not in the best interest for [Child] to view [Father] as either a father or a reunification resource, which is also generated by the fact he's noncompliant." N.T., 5/11/16, at 3. Thus, the court did not make a finding of fact and we disagree with its suggestion that Father's failure to object should result in waiver.

Thus, we decline to disturb the order of the trial court directing OCY to cease services and visitation to Father and file a petition to terminate Father's parental rights.

Order affirmed. OCY's motion to quash denied.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/19/2016