J-S50030-18

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| IN THE INTEREST OF: I.A., S.A., AND I.A. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: R.A., JR., NATURAL FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 692 WDA 2018 |

Appeal from the Order Dated February 16, 2018
In the Court of Common Pleas of McKean County
Civil Division at No(s): CP-42-DP-0000038-2013,
CP-42-DP-0000039-2013, CP-42-DP-0000061-2017

BEFORE:   BOWES, J., OTT, J., and KUNSELMAN, J.

MEMORANDUM BY OTT, J.:                    FILED NOVEMBER 27, 2018

R.A., Jr. ("Father"), appeals from the February 16, 2018 permanency review orders in the Court of Common Pleas of McKean County that suspended his supervised visits with his daughters, I.A., born in June 2011, and S.A., born in October 2012, and his son, I.A., born in March 2015 (collectively, "Children").  We affirm.

The subject orders arise from the trial court placing Children in the emergency protective custody of McKean County Children and Youth Services ("CYS") on June 1, 2017, and adjudicating them dependent on August 28,

2017, due to Father's mental health and deplorable home conditions.[1] Father and C.C. ("Mother") (collectively, "Parents") were required to obtain mental health and drug and alcohol evaluations, follow through with all recommended treatment, and participate in random drug screens, inter alia.[2] Order, 8/28/17, at 2. The court directed CYS to establish a schedule and a location for visits between Parents and Children. Id. CYS scheduled supervised visits in Parents' home every weekend for four hours and every Monday evening for two hours. N.T., 2/16/18, at 13.

The first permanency review hearing occurred on November 13, 2017. The trial court found, in part, that Father has difficulty controlling his anger when dealing with CYS staff and service providers, and that he had a concerning number of pets in his home, including seven dogs and multiple lizards. The court explained:

> When the court raised these concerns [about the dogs in Father's home,] Father immediately indicated that the dogs were not his and if they were he would resolve the issue by "putting a bullet in their heads." The court then, for Father's benefit, tried to explain that that would not resolve the problem and it would only create worse issues such as Father facing animal cruelty charges. Father became more and more agitated over the next several minutes until the point that he jumped up in the middle of the hearing and

_____

[1] The deplorable home conditions included, but were not limited to, a lack of running water and a broken sewage system.

[2] The record reveals that the court previously adjudicated the older children, I.A. and S.A., dependent in November 2013, due to Parents' mental health and substance abuse problems and deplorable home conditions. The court returned I.A. and S.A. to Parents' custody in June 2014, but they remained under the protective supervision of CYS until July 2015.

> very loudly indicated that his attorney could deal with it as he was leaving. His case manager left to try [to] calm Father down. The court indicated to Father's case manager [that] Father could return if he wanted to and if he could remain calm. Father could be then heard yelling in the hallway for several minutes about the "system" with obscenities thrown into it. Security was eventually able to have Father leave the building.

Order, 11/13/17, at 2. The court stated, "Regretfully the failure to get beyond this hostility after years of attempts [by CYS and service providers] demonstrates that it is unlikely that the situation will change in the future." Id. at 2-3. The court stated that the "goal is still reunification," but directed CYS to establish a concurrent permanency goal. Id. at 3. The court directed that visits continue between Parents and Children.

The next permanency hearing occurred on February 16, 2018, during which CYS presented the testimony of its caseworker, Ed McQuillen. Father testified on his own behalf, and he presented the testimony of both the behavioral specialist and the mental health case manager from The Guidance Center, Laura Rhodes and Terry Carr, respectively.

The court issued the subject permanency review orders on February 16, 2018, wherein it found, "[Father] is struggling with mental health issues including an inability to control his anger." Order, 2/16/18, at 2. The court explained that, during cross-examination, Father "went on a verbal and loud tirade from the witness stand and then left. Again, as in the previous hearing, he could be heard yelling obscenities in the hallway of the courthouse." Id.

The trial court suspended Father's visits with Children for the following reasons:

> 1) Father's failure to follow through with previous requirements; 2) his hostility to CYS staff during visits; 3) his alarming actions at the last two hearings; and, 4) troubling statements he has made to the children during visits. . . .[3]

Order, 2/16/18, at 3.

On April 18, 2018, Father filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P.

_____

[3] Mr. McQuillen, the CYS caseworker, testified that Father stated to his oldest child, I.A., at the conclusion of a supervised visit, "Now, when you go back to the foster home, you be as bad as you possibly can when you get there." N.T., 2/16/18, at 23. In addition, Ms. Rhodes, the behavioral specialist, testified that Father told S.A., "to punch the dog in the jaw." Id. at 32.

1925(a)(2)(i) and (b).[4, 5]  The trial court filed its Rule 1925(a) opinion on April 25, 2018, which is one page in length.

Father presents two issues on appeal:

A. Did the trial court err when it suspended all contact between Father and [C]hildren without the finding by clear and convincing evidence that such contact poses a grave danger?

_____

[4] The subject order, dated February 16, 2018, was filed on March 27, 2018. However, the order was not entered on the juvenile court docket in accordance with the requisite rules of appellate and civil procedure.  Rule 108(b) provides that the date of entry of an order is "the day on which the clerk makes the notation in the docket that notice of entry of the order has been given as required by Pa.R.Civ.P. 236(b)."  Pa.R.A.P. 108(b).  Rule 236(b) requires that "[t]he prothonotary shall note in the docket the giving of the notice. . . ."  Pa.R.C.P. 236(b).  In Frazier v. City of Philadelphia, 735 A.2d 113, 115 (Pa. 1999), our Supreme Court held that the 30-day appeal period is not triggered until the clerk makes a notation on the docket that notice of entry of the order has been given.  See Pa.R.A.P. 903(a) (providing that a notice of appeal "shall be filed within 30 days after the entry of the order from which the appeal is taken.").  As such, in this case, Father's appeal period was not triggered; therefore, his notice of appeal, filed on April 18, 2018, is not untimely.

[5] The record reveals that Father filed one notice of appeal from the permanency review order, which was copied and included in the separate records.  We caution Father that the correct procedure in this circumstance is to file a separate notice of appeal for each child.  See Pa.R.A.P. 341, Note ("Where . . . one or more orders resolves issues arising on more than one docket or relating to more than one judgment, separate notices of appeal must be filed.").  Further, our Supreme Court has recently held that, in all future cases, the failure to file separate notices of appeal from an order resolving issues on more than one docket will "require[] the appellate court to quash the appeal."  Commonwealth v. Walker, 185 A.3d 969, 977 (Pa. 2018).  Because Father filed his notice of appeal before our Supreme Court filed Walker, we do not quash his appeal.

- 5 -

> B. Was there clear and convincing evidence presented to the trial court to find that contact between Father and [C]hildren posed a grave danger to [C]hildren?

Father's brief at 7.

Relevant to Father's issues is whether the trial court changed Children's placement goals from reunification. The subject permanency orders are ambiguous in this regard, which impedes our review.[6] Therefore, on October 10, 2018, this Court remanded the case for the trial court to clarify in a supplemental Rule 1925(a) opinion whether it intended to change the goals from reunification in the subject orders. See In the Interest of I.A., S.A., and I.A., 692 WDA 2018 (Pa. Super. Oct. 10, 2018) (unpublished memorandum). The trial court filed its supplemental opinion on October 15, 2018, wherein it stated, "At the time of the entry of the February 16, 2018[] [o]rder[s] this court had concluded that reunification was not a reasonable option." Trial Court Opinion, 10/15/18, at 1. As such, we conclude that the

_____

[6] We caution the trial court that the Pennsylvania Juvenile Act, 42 Pa.C.S. § 6301 et seq., provides that matters to be determined at permanency hearings include, in part, the "appropriateness and feasibility of the current placement goal for the child[,]" and "[t]he likely date by which the placement goal for the child might be achieved." 42 Pa.C.S. § 6351(f)(4) and (5). In addition, the Act provides, "Based upon the determinations made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following, in part: (1) If and when the child will be returned to the child's parent. . . . (2) If and when the child will be placed for adoption. . . ." 42 Pa.C.S. § 6351(f.1)(1) and (2).

trial court intended to change Children's goals from reunification to adoption in the subject orders.[7]

We review dependency cases for an abuse of discretion. We must "accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but [we are] not require[d] . . . to accept the lower court's inferences and conclusions of law." In the Interest of L.Z., 111 A.3d 1164, 1174 (Pa. 2015) (citation omitted).

This Court has explained that the standard against which visitation between parents and their dependent children is measured depends upon the goal mandated in the family service plan. See In re C.J., 729 A.2d 89 (Pa. Super. 1999). Where the permanency goal is reunification, a court may not deny or reduce visitation unless it poses a grave threat to the child. Id. at 95. This standard is satisfied when the parent demonstrates a severe mental or moral deficiency that constitutes a grave threat to the child. Id. However, where the goal is no longer reunification, the court may suspend, limit, or deny visitation if it is in the best interests of the child. Id. ("The 'best interests'

_____

[7] The trial court states that Father's appeal should be quashed because the orders are not final and appealable. See Trial Court Opinion, 4/25/18. We disagree insofar as prevailing case law establishes that the orders suspending Father's visitation are appealable. See In re C.B., 861 A.2d 287, 289 n. 1 (Pa. Super. 2004) (concluding that the order suspending the father's visitation was a final, appealable order pursuant to In re H.S.W.C.-B., 836 A.2d 908, 911 (Pa. 2003), which held, "An order granting or denying a status change, as well as an order terminating or preserving parental rights, shall be deemed final when entered.")).

standard, in this context, is less protective of parents' visitation rights than the 'grave threat' standard.").

Instantly, because we have determined that the trial court intended to change Children's goal from reunification to adoption, the "best interests" standard applies. The trial court reasoned as follows:

> It is not in [Children's] best interest to have visits with Father when Father cannot remain calm for more than 15 or 20 minutes at a review hearing before lashing out at those around him. Further, it is not in [Children's] best interest to have contact with their Father when he is refusing to establish and follow his mental health treatment plan and advising [C]hildren at visits to be "as bad as you possibly can when you get there (back to the foster home)." N.T., 2/16/18, at 23; and, "to punch the (family) dog in the jaw." Id. at 32.

Trial Court Opinion, 10/15/18, at 2 (unpaginated). We discern no abuse of discretion.

Mr. McQuillen, the CYS caseworker, testified, "I think a lot of the negative behavior [by Father] . . . occurring over at the home is starting to kind of carry over into the way the children are acting." N.T., 2/16/18, at 22. For instance, he stated that during the supervised visit on December 31, 2017, Father "had gotten upset and called me a f[_ _ _]ing queer." Id. at 22-23. Mr. McQuillen testified that, because the visit was not going well, he "chose to end the visit at that time." Id. at 23. Father responded by "look[ing] to [I.A., the oldest child] and . . . said to her 'Now, when you go back to the foster home, you be as bad as you possibly can when you get there.'" Id. Further, Mr. McQuillen testified that I.A., the oldest child, "would go around [at school]

telling people that 'My dad's going to beat you up' if she . . . wasn't happy with things. . . ." Id. at 24. He also testified that "after the Sunday night visits, . . . the kids have had . . . issues with misbehaving . . . in school." Id. at 22.

In addition, Ms. Rhodes, the behavioral specialist, testified on cross-examination by CYS's counsel regarding disturbing behavior by Father that Children have mimicked during supervised visits, as follows.

Q. [I]n the Permanency Hearing Form, it's reported about . . . [Father] punching the dog and then telling one of the children to do that. Did you witness that?

A. Yes, I did.

Q. And tell us what happened.

A. . . . [Father] felt that he needed to make sure [that the dogs] listened because he was concerned about the previous Court hearing [when] the dogs [were] mentioned. So, he feels, like, if he raises his hand or throws something at them or hits them, that they will go lay down[,] and they won't bother the providers or the caseworkers that are in the home. And so, that has occurred on multiple visits. I don't know which visit you're speaking to specifically, but it has occurred multiple times. . . . And then the kids will often try to help by either echoing the words or mimicking the behavior [of Father]. . . .

Q. My understanding is that on one of those occasions, that he was telling one of the kids to punch the dog.

A. That it's . . . okay for them to [punch the dog] in order to get the dog to lay down.

Q. [O]n January 12[, 2018,] [it is] reported[,] "[Father] told [S.A.] to punch the dog in the jaw." You told [S.A.] that "Oh, daddy just meant for you to move him aside," and he said, "No, I meant for her to punch him."

. . .

    Q. That . . . is correctly reported[?]

    A. Yes, that is correct.

Id. at 31-32.

    We conclude that the foregoing testimonial evidence, as well as Father's conduct during the subject permanency review hearing, supports the trial court's findings that Father's inability to control his anger persists. Further, the evidence supports the court's findings that Father's statements and behavior around Children are troubling, which, in turn, have negatively affected Children's behavior. We discern no abuse of discretion by the trial court in concluding that Father's supervised visits are not in Children's best interests. Accordingly, we affirm the February 16, 2018 orders suspending Father's visitation.

    Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 11/27/2018