J-A16004-18

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| K.D., | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| E.D., | |
| Appellant | No. 485 EDA 2018 |

Appeal from the Order Entered January 10, 2018
In the Court of Common Pleas of Wayne County
Civil Division at No(s): 336-2015 DR

BEFORE: BENDER, P.J.E., LAZARUS, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY BENDER, P.J.E.:                    **FILED AUGUST 23, 2018**

E.D. (Father) appeals from the trial court's order entered on January 10, 2018, that granted K.D.'s (Mother) exceptions to a master's report and recommendation, resulting in the denial of Father's petition requesting supervised visitation with the two youngest of Mother's and Father's four children. Following our review, we affirm.

The scope and standard of review in custody matters is as follows:

> [T]he appellate court is not bound by the deductions or inferences made by the trial court from its findings of fact, nor must the reviewing court accept a finding that has no competent evidence to support it. ... However, this broad scope of review does not vest in the reviewing court the duty or the privilege of making its own independent determination. ... Thus, an appellate court is empowered to determine whether the trial court's incontrovertible factual findings support its factual conclusions, but it may not interfere with those

conclusions unless they are unreasonable in view of the trial court's factual findings; and thus, represent a gross abuse of discretion.

***R.M.G., Jr. v. F.M.G.***, 986 A.2d 1234, 1237 (Pa. Super. 2009) (quoting ***Bovard v. Baker***, 775 A.2d 835, 838 (Pa. Super. 2001)). Moreover,

[O]n issues of credibility and weight of the evidence, we defer to the findings of the trial [court] who has had the opportunity to observe the proceedings and demeanor of the witnesses.

The parties cannot dictate the amount of weight the trial court places on evidence. Rather, the paramount concern of the trial court is the best interest of the child. Appellate interference is unwarranted if the trial court's consideration of the best interest of the child was careful and thorough, and we are unable to find any abuse of discretion.

***R.M.G., Jr., supra*** at 1237 (internal citations omitted). The test is whether the evidence of record supports the trial court's conclusions. ***Ketterer v. Seifert***, 902 A.2d 533, 539 (Pa. Super. 2006).

***A.V. v. S.T.***, 87 A.3d 818, 820 (Pa. Super. 2014).

Father raises the following two issues for our review:

I.   Did the [h]onorable [t]rial [c]ourt err as a matter of law by substituting its own credibility determinations for those of the Master?

II. Did the [h]onorable [t]rial [c]ourt misapply the facts and err as a matter of law in denying [F]ather['])s request for periods of therapeutic supervised visitation with two of his four children and in finding that [F]ather poses a grave threat when the facts establish that the children did not suffer sexual physical abuse or emotional abuse at the hands of [F]ather?

Father's brief at 3.

Here, in its opinion, the trial court set forth the factual and procedural history of this case and gave an extensive discussion of all the testimony provided by the various witnesses, especially the testimony of the professionals, at the hearings held before the master. Furthermore, citing *Moran v. Moran*, 839 A.2d 1091, 1093 (Pa. Super. 2003), the trial court recognized that "[t]he Report and Recommendation from a master is only advisory, but it must 'be given the fullest consideration, particularly on the question of credibility of witnesses, because the master ha[d] the opportunity to observe and assess the behavior and demeanor the parties.'" Additionally, the court noted that Father's arguments appear to request that this Court re-find facts and re-weigh the evidence. However, our standard of review requires that we "accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations." *C.R.F., III v. S.E.F.*, 45 A.3d 441, 443 (Pa. Super. 2012). Rather, we "may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court." *E.D. v. M.P.*, 33 A.3d 73, 76 (Pa. Super. 2011).

We have reviewed the certified record, the briefs of the parties, the applicable law, and the thorough, well-reasoned opinion authored by the Honorable Raymond L. Hamill of the Court of Common Pleas of Wayne County, dated January 11, 2018. We conclude that Judge Hamill's extensive opinion

correctly disposes of the issues presented by Father in this appeal. Accordingly, we adopt the court's opinion as our own and affirm the custody order on that basis.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/23/18

IN THE COURT OF COMMON PLEAS OF THE 22ND JUDICIAL DISTRICT
COMMONWEALTH OF PENNSYLVANIA
COUNTY OF WAYNE

_K.D._

~~████████████~~,
Plaintiff

VS.

_E.D._

~~████████████~~,
Defendant

:
:
:
:
:
:
:
:
:
:
:
:
:

NO. 336-DR-2015

---

### OPINION and ORDER

---

Presently before this Court are Plaintiff's and Defendant's Exceptions to the Report and

Recommendation of the Custody Master dated June 9, 2017. In response to the Master's Report,

_K.D._

Plaintiff, ~~████████████~~ [hereinafter "Mother"] filed forty (40) specific Exceptions objecting to

the findings made by the Master, errors that the Master made in his findings, and to the

_E.D._

Recommendations made by the Master. Defendant, ~~████████████~~ [hereinafter "Father"]

lists two (2) Exceptions objecting to errors made by the Master in his "Discussion" and

"Findings of Fact." As this Court has a long history with this custody matter, and, due to the

complexity of legal issues involved and the emotional repercussions any decision by the Court

will have, the purpose of the following opinion is to make clear this Court's reasoning in

reaching its decision.

CERTIFIED FROM
THE RECORD

JAN 11 2018

EDWARD G SANDERCOCK
PROTHONOTARY & CLERK

### BACKGROUND

#### a. Family History

The parties, Mother and Father, are the parents of four (4) minor children, J.D. age 15,

J.D. age 11, S.D. age 8, and S.D. age 4. The parties were married on May 28, 2000 and separated

in March 2015. It was not until after the parents separated that the children disclosed physical

abuse at the hands of their father and that the two older children disclosed sexual abuse. Report

of the Guardian Ad Litem, at 1. At this time, Father is seeking to establish supervised visitation with his children. Master's Report and Recommendation, at 1 [hereinafter "Master's Report"].

Over the course of several days of testimony it was learned that the parties' separation occurred essentially after Father confessed to Mother that he viewed child pornography websites in the past. Master's Report, at 5. Testimony was also heard on the complex health issues of J.D. age 15, whose problems started before Mother and Father separated. Id. The condition started in April 2014 with severe pain in the belly and groin area, but after being seen by many specialists there is still no clear diagnosis. Report of the Guardian Ad Litem, at 2.

What Father, as a physician, diagnosed as perhaps a sinus infection turned into intestinal symptoms, which only got worse and later necessitated emergency room trips, tests of many kinds, and a gall bladder removal. Id. In July 2014, J.D. age 15 was admitted to the Children's Hospital of Philadelphia for further tests, and at one point he spent six (6) days hospitalized, and he had to be placed on a feeding tube. Id. While the cause of his symptoms was not conclusively diagnosed, the Custody Master found that "[t]here was a psychological element contributing to those physical issues related to the relationship between [J.D. age 15] and his father." Id., at 19.

Considering himself a religious man, Father thought about his past sins and thought disclosing his illicit activity to Mother would secure God's relief for his ill son. Id. It was in 2014 when J.D. age 15 began losing weight that Father came to Mother and confessed that he viewed homosexual pornography, and there was also an admission that Father himself was molested as a teenager in France by his cousins. Id. On or about March 30, 2015, there were further admissions by Father to having viewed pornography while in medical school in Grenada, in Staten Island when they lived there, and then in Williamsport. Id., at 15. Following the March 30, 2015 incident Mother then left the marital home with the children to stay with her parents. Id.

The following evening, Father signed a document giving Mother custody of the children. Id., 14-15.

It was not until after March of 2015 when Mother and the children were living away from the marital home that J.D. age 15 disclosed to Mother the physical abuse he experienced from Father – "being hit with a paddle and the emotional abuse as the father cursed in French." Id., at 15. As to the allegations of sexual abuse, J.D. age 15 testified to his father touching him at nighttime while he was in his bunk in his pajamas and at other times. Id., at 17. J.D. age 15 stated that he fears his father and hates him. Id. Additionally, he objected to his younger siblings being with Father and that he would still be afraid even if he was in a supervised visitation setting with Father. Id.

Testimony from J.D. age 11 was similar in that he told of being hit by an angry Father with a wooden spoon even when he did nothing wrong. Id. He similarly testified that he was touched at night in his genital area by Father, and that Father's physical abuse would occur on Wednesdays when Father watched the children while Mother was shopping. Id. J.D. age 11 likewise resisted even supervised visitation. Id. The testimony of S.D. age 8 was similar. She does not want to see Father, and she testified to Father hitting her once but seeing Father hit J.D. age 11 and S.D. age 4., who at the time of the abuse was just a baby. Id.

The remaining family history hinged on by the Master concerns the parents' pervasive religious beliefs. Testimony was heard on Father's involvement with No Greater Joy Ministry [hereinafter "the Pearl Ministry"] in Pleasantville, Tennessee, a church led by Michael Pearl, with whom the parties first became involved in 2004. Id., at 15. In 2010, the parties visited the Pearl Ministry when J.D. age 15 was 8 and J.D. age 11 was 4 for a sermon regarding sex education for children. Id., at 6. Father stayed in contact with Pearl Ministries after 2010, and he was so involved that he would provide medical services there, provide financial support, and

. distribute their literature in his own patient exam rooms. Id. By the conclusion of testimony, Father alleged that he no longer believes it is a fundamental Christian Ministry, but rather that it is a cult. Id., at 8.

### b. Reports of the Professionals Involved

The majority of professionals involved testified that the children need more individual counseling based on their needs and that clinically supervised visitation with any of the children would not be appropriate at this time. Father's chief witness, Dr. Robert Gordon, an eminently qualified psychologist with years of experience dealing with sex offenders and in custody cases, was the only professional to specifically advise supervised visitation. Master's Report, at 19. While he never personally met with the children or Mother, Dr. Gordon believed after analyzing tests administered by other professionals involved that "[the children] should be placed in 'supervised therapeutic sessions ... with the alienated parent' as such has been found to be effective for the well-being of the children. Master's Report, at 2.

In contrast to Dr. Gordon, the professionals who have been around the children the longest agreed that supervised visitation is not appropriate at this time. Additionally, they testified about the great lengths they had to go through to first earn the trust of the children before they could develop a relationship and make progress in treatment.

Judith Munoz, MA, recommended that the two older children undergo counseling. Id., at 21. Ms. Munoz became involved with the matter in October of 2015 at the request of Wayne County Children and Youth Services to investigate alleged emotional abuse by Father against the two older children. Id., at 2. In her recommendations, she stated "[J.D. age 15] and [J.D. age 11] are experiencing much anxiety, tension and fear, although it does not appear to be the result of identifiable acts which intentionally caused mental injury." Id., at 4. Ms. Munoz concluded that the test results did not support a finding that Father was an emotional abuser or that Mother

Page 4 of 15 a

presented as one who was striving to alienate her children. Id. The evidence reflects that Ms. Munoz is open to reunification counseling, however, Father would need to be treated as well so that the children are not faced with a situation where they will feel that what they have said and been through does not matter. N.T. Vol. I, Session II, at 34.

Heather Evans LCSW opined that J.D. age 15 and J.D. age 11 suffer from PTSD and have fear and/or anxiety towards Father. Id. at 21. She started working with the children in December of 2015. Id., at 12. Based off her own interviews and reports conducted by two gastroenterologists at Children's Hospital of Philadelphia and a CRNP with Lighthouse Psychiatry, she diagnosed the two older children with PTSD. Id. Both children continue to have anger toward Father as a result of abuse attributed to Father. Id. Ms. Evans considered even supervised visitation with Father to be a re-victimization, and given the bonded nature of the family, the two older children would be disturbed if their younger siblings were subjected to visitation. Id.

Mr. Chris Charleton, LCSW who holds a MSW, has been working with Mother and the children since May 2016. The Children's Hospital of Philadelphia screened Mr. Charleton as being competent to deal with and provide intensive outpatient therapy to J.D. age 15, who was displaying possible symptoms of suicide ideology. Id., at 10. Mr. Charleton also diagnosed the two older children with a version of PTSD. Id. He testified that there was no reason to challenge the credibility of the children's statements that they were beaten by Father. Id., at 11. Mr. Charleton recommended that the children must first go through much therapy to reduce their feelings of having been traumatized prior to interacting with Father. Id. He estimated that it would take between 1.5 and 2 years before supervised visitation might be helpful. Id.

Finally, the Guardian *Ad Litem*, Attorney Leatrice Anderson, also concluded that supervised visitation would not be in the best interest of the children at this time. Report of the

Guardian Ad Litem, at 12. Attorney Anderson was appointed pursuant to the parties' custody agreement in October 2015. Id., at 1. During her interviews she witnessed a unity and solidarity between the siblings. Id., at 8. Each child individually denied wanting to see Father again, and each had a protective capacity toward one another that could be harmed by any siblings' interaction with Father. Id. In Attorney Anderson's words,

> "I have to consider this sibling group as a unified entity... at this time, I do not feel I can separate each child from the other and view him or her individually without consideration of the impact that separation will have on them. They hold a real fear and apprehension of seeing their father again. The oldest three are very cognizant of the abuse they suffered and witnessed. These kids are very close and look out for one another in a protective capacity. They hold one another's feelings and fears close. I cannot conclude that separating the two or three youngest children to implement visitation is in any of their best interests at this time."

Report of the Guardian Ad Litem, at 12.

By the conclusion of testimony, the record evidence reflected that Father did admit to viewing child pornography, he did admit to using a plastic spoon to discipline his children as he did believe in physical discipline, and he did admit supporting a controversial religious organization. Father also admitted that when the marriage came apart, he was at the minimum emotionally fragile, and he threatened to harm himself or end his own life. Further, and of critical importance, Father admitted that he is not in counseling, and that he has not sought counseling for any issue affecting the family at this point.

The Master made three (3) Recommendations to conclude is report, to which Mother filed forty exceptions to two, namely: (1) that Father have only clinically supervised visitation by Dr. Chet Mukliewicz with his two youngest children, S.D. age 8 and S.D. age 4; and (2) that Father consult a therapist to discuss why he viewed pornography, why he disciplined his children using a plastic spoon, why he threatened to take his own life, why he became so involved with

the Pearl Ministry and all other seriously bizarre behaviors which an intelligent man, himself a physician, must deal with before he can hope to have more involvement with his children. Id.

## DISCUSSION

The Report and Recommendation from a master is only advisory, but it must "be given the fullest consideration, particularly on the question of credibility of witnesses, because the master has the opportunity to observe and assess the behavior and demeanor of the parties." Moran v. Moran, 839 A.2d 1091, 1093 (Pa.Super. 2003) (citing See Simeone v. Simeone, 551 A.2d 219, 225 (Pa.Super. 1988)). In custody and visitation matters, the paramount concern of this Court is the best interests of the children. McMillen v. McMillen, 602 A.2d 845 (Pa. 1992). "The best-interests standard, decided on a case-by-case basis, considers all factors that legitimately have an effect upon the child's physical, intellectual, moral, and spiritual wellbeing." Saintz v. Rinker, 2006 PA Super 129, 902 A.2d 509, 512 (Pa.Super. 2006).

Relevant to custody cases are the factors set forth in Section 5328(a) of the Child Custody Act [hereinafter "Act"], which provides:

> § 5328. Factors to consider when awarding custody.
> (a) Factors. – In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:
>
> > (1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.
> >
> > (2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a)(1) and (2) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. § 5328(a).

The Superior Court has stated that "[a]ll of the factors listed in section 5328(a) are required to be considered by the trial court when entering a custody order." J.R.M. v. J.E.A., 2011 PA Super 263, 33 A.3d 647, 652 (Pa.Super. 2011). Here, the weight of the evidence does not support Father's position if we were deciding legal custody, primary physical custody, partial physical custody, or any type of custody but what Father requests. However, Father solely seeks to initiate clinically supervised visitations invoking Title 23 Pa.C.S.A. Section 5323(e) with the imposition of appropriate safeguards, particularly the supervision of Dr. Chet Muklewicz.

Pursuant to Section 5323(e), after taking into consideration the factors under section 5328(a)(2), "if the court finds that there is an ongoing risk of harm to the child or an abused party and awards any form of custody to a party who committed abuse or who has a household member who committed the abuse, the court shall include in the custody order safety conditions designed to protect the child or the abused party." Therefore, because Father seeks a limited form of custody pursuant to Title 23 Pa.C.S.A. Section 5323(e), the standard for evaluating whether authorizing clinically supervised visitation is appropriate is guided by relevant case law.

While it is well-settled in custody disputes that the fundamental issue is the child's best interest, in a dispute such as this where supervised visitation is at issue the stricter, "grave threat to the child standard" applies. *See* In Re Damon B., 460 A.2d 1196 (Pa. Super. 1983). "A parent will be denied visitation only in those instances where the record shows that the parent is severely mentally or morally deficient as to constitute a grave threat to the child's welfare." Niadna v. Niadna, 343 Pa. Super. 298, 302, 494 A.2d 856, 858 (Pa.Super 1985). This standard can be met where the evidence clearly shows that even supervised visitation would severely

endanger the child. *See* In Re'Rhine, 456 A.2d 608 (Pa.Super. 1983); In the Interest of C.B., 861 A.2d 287 (Pa.Super. 2004).

By way of example in applying this standard, in the worst sense, case precedent has held that a father may be denied visitation of his biological son when the father sexually abused his stepdaughter in front of his son, which constituted an act of such moral deficiency that it posed a grave threat to the son. In the Interest of C.B., 861 A.2d 287, 294. There, the evidence of sexual abuse perpetrated by father against stepdaughter C.B., was overwhelming – both interviews with case workers and psychologists as well as physical examinations revealed findings consistent with sexual abuse. Id. Although father never sexually abused his biological son, the court held that, "Father has displayed such severe moral deficiency that he constitutes a grave threat to [biological son]. Regardless of whether his conduct resulted in criminal convictions, numerous CYS witnesses attested to the horrific sexual abuse perpetrated by Father on a ten-year-old girl in his care and custody." Id., at 294. Therefore, the Superior Court held that denying father visitation with his biological son was proper under the "grave threat to the child standard."

In another application of the "grave threat to the child standard," in Rosenberg, Dr. Rosenberg and Mrs. Rosenberg were the parents of two daughters, R.R. age ten and I.R. age seven. Rosenberg v. Rosenberg, 350 Pa. Super. 268, 270 (Pa.Super. 1985). Mother was awarded temporary custody of the daughters and Dr. Rosenberg visitation, which mother objected to. Id. Mrs. Rosenberg supported her objections to Dr. Rosenberg's visitation based on accusations that he had sexually abused I.R. age seven, which accusations the court found the evidence did not support. Id., at 271. The evidence reflected that I.R. age seven testified that she did not care for her father "because Daddy does things to me ... He touches me in my private places. So I don't think anybody would like that," which statement correlated with claims made to her mother that

her father had on occasion fondled her in her vaginal and rectal areas. Id., at 272. Dr. Rosenberg denied such accusations Id.

R.R. age 10 testified that her father had never fondled her in the same way as described by her sister, but R.R. did testify that "her father was overly affectionate and sometimes hugged and kissed her too much." Id. The professionals who examined the daughters, a psychologist and two psychiatrists, "differed in their opinions as to whether [I.R. age seven]'s accusations against father were credible or the result of coaching by her mother." Id., As there was no other objective evidence, with the exception of her accusation that I.R. age seven had been fondled by father, "the hearing judge, who saw and heard the witnesses, decided this conflict in favor of [father]." Id. Therefore, because it was within the hearing judge's discretion to make this determination based on the facts and in applying the "grave threat to the child standard," the Superior Court found neither error of law nor abuse of discretion in making this determination. Id.

In a final application of the "grave threat to the child standard," in Niadna, the child's birth mother and non-custodial parent, sought to exercise her visitation rights. 343 Pa. Super, at 300-01. Following the divorce, custody of the child was awarded to father, with weekend and holiday visitations awarded to mother, who shortly after the divorce became a resident of California. Id., at 301. Mother testified that she attempted to maintain contact with the child and to visit once but was refused by father. Id. Nine years after the court order granting father custody was entered, mother filed the petition at issue seeking a modification of the prior visitation schedule so that she might visit her daughter. Id. Father challenged on the basis that the court should not allow personal visits to California. Id., at 303.

In applying the "grave threat to the child standard," the court held that daughter's best interests and welfare would not be harmed by ordering visitation in California. Id. The record reflected that mother led a settled and secure life in California with her sons and husband. Id., at

302. Testimony from family, friends, and professionals was heard as to mother's qualified parental fitness; notwithstanding the long period of time in daughter's life that mother was not involved. Id. The hearing judge interviewed daughter in chambers and learned that, while she was not averse to developing a relationship with mother, she was apprehensive about going to California. Id. Nevertheless, the hearing judge found that there was "no evidence that mother suffered from mental or moral deficiencies that would prevent the full exercise of her rights as a non-custodial parent." Id., at 303. Further, there were no apparent reasons for supposing that a visit to California would prove harmful to a young and bright child. Id. Therefore, based on this record the Superior Court found that there was no abuse of discretion on the part of the hearing judge in ordering visitation in California. Id., 303-04.

Turning to the case at bar, the Custody Master here found that the father has deficiencies, but they are not so severe as to deny him the clinically supervised visitation requested." Master's Report, at 26. However, it is the opinion of this Court that the Master has not made the case that it is in the best interest of any of the children to have supervised visitation with Father. Supervised visits pursuant to Section 5323(e) may reduce the risk of physical harm to the children, but supervised visits do nothing to reduce the high risk or emotional and psychological harm. With the exception of Dr. Gordon's conclusions, there is not a hint of valid record evidence that the children will benefit from supervised visitation. In fact, it would appear that supervised visitation would only be to Father's benefit when he himself has not yet taken any steps for counseling the very behaviors the children have been drastically affected by.

In absolute contrast to what has been recommended, the evidence reflects that the children will ultimately be harmed. The evidence established that Father subjected his children to a pattern of sexual, physical, and emotional abuse for many years before the parties' separation in 2015. This abuse had a traumatic effect particularly on the three older children, which is

further evidenced by J.D. age 15's illness and how long it took for the children to come forward about the abuse. Lastly, Father's conduct is aggravated by his admission to viewing child and other pornography.

The professionals who have been involved since the onset of this matter in 2015, Heather Evans, Chris Charleton, and Attorney Leatrice Anderson, all concluded that supervised visitation would not be in the children's best interest at this time. Ms. Munoz testified that to do this reunification counseling sought, Father must take responsibility or we are putting the children in a situation where they will feel like what they have said does not matter. Additionally, evidence from trial established that now, after years of therapy, the older two children are getting to the point where they are starting to recover from the trauma. The fact that Father would even propose that the children be taken out of the care of these professionals who have been treating them for years demonstrates his moral deficiency and his lack of concern for the children's best interests.

It is the opinion of this Court that, after taking into consideration all of the evidence – the allegations of physical, sexual, and emotional abuse, Father's confirmed use of corporal punishment, and threats to endanger himself and family members to keep such punishment secret – the record rises to a showing that Father is severely mentally or morally deficient as to constitute a grave threat to the welfare of the children. Further, Father has shown no insight into how his conduct has affected and harmed his children. While the allegations of sexual abuse were deemed unfounded, and therefore makes the case at bar fall somewhere between the factual analyses employed in In re C.B. and Rosenberg, this fact alone is not dispositive that it is an appropriate time for Father to engage in clinically supervised visits with the two younger children.

Again, in Rosenberg, the hearing judge found that, "[t]he experts differed in their opinions as to whether [I.R. age seven's] accusations against her father were credible or the result of coaching by her mother." Rosenberg, 350 Pa.Super, at 272. Further, the hearing judge found there was lack of objective evidence of abuse. Id. In contrast here, the majority of professionals found the children's accusations credible. As additional objective evidence that supervised visitation would constitute a grave threat to the children is J.D. age 15's exceptional health issues, which as the Master stated, there exists "a psychological element contributing to those physical health issues related to the relationship between J.D. age 15 and his father." Master's Report at 19.

In concluding, this Court is cognizant of the emotional repercussions this decision will have on the family. However, based on the record evidence, this Court is constrained to find that clinically supervised visitation with Father, who has exhibited behavior of such severe mental or moral deficiency, would constitute a grave threat to the children's welfare. Therefore, this Court holds that the Master erred as a matter of law and abused his discretion in recommending that the children have supervised visitation with Defendant.

# ORDER

AND NOW, to wit, this __10__ day of January, 2018, upon consideration of Plaintiff's Exceptions to the Master's Report and Defendant's Exceptions to the Master's Report, it is

*K. D.*

hereby the **ORDER** of this Court that Plaintiff, ▮▮▮▮▮▮▮▮'s, Exceptions to the Master's Report are **GRANTED.**

BY THE COURT

RAYMOND V. HAMILL
SENIOR JUDGE
22nd Judicial District

cc:     Theodore Hoppe Jr., Esq.
        Arthur Silverblatt, Esq.
        Leatrice Anderson, Esq.
        Brendan Ellis, Esq.
        Warren Schloesser, Esq. (Master)

*SM*