J-S28042-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: T.I.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.M. AND S.M., PARENTS | : | |
| | : | No. 668 MDA 2022 |

Appeal from the Order Entered April 1, 2022
In the Court of Common Pleas of Adams County
Juvenile Division at No(s): CP-01-DP-0000012-2021

BEFORE: OLSON, J., McLAUGHLIN, J., and KING, J.

MEMORANDUM BY KING, J.:                    **FILED: DECEMBER 2, 2022**

Appellants, T.M. ("Father") and S.M. ("Mother") (collectively "Parents"), appeal from the order entered in the Adams County Court of Common Pleas, which entered a finding of abuse against Parents concerning their minor child, T.I.M., born in February 2007 ("Child"). We affirm.

The relevant facts and procedural history of this case are as follows. On March 3, 2021, the Adams County Children and Youth Agency ("Agency") received a referral regarding Child. After the court compelled Parents to cooperate, the Agency conducted an inspection of the house on March 4, 2021. Following the inspection, Child was admitted to the hospital for concerns of his wellbeing. The Agency was granted emergency protective custody of child on March 4, 2021.

On March 16, 2021, the Agency filed a petition for dependency and

sought a concurrent finding that Child was a victim of child abuse. The court

held hearings on the petition on May 20, 2021, June 21, 2021, July 22, 2021,

August 5, 2021, and August 10, 2021. The court adjudicated Child dependent

on August 10, 2021.[1]

The court summarized the basis for the finding of dependency as

follows:

> The Child was born [in February 2007]. He was initially placed in the custody of [Parents] when he was six months old and has remained in their sole custody since that time. Ultimately, the parental rights of his natural parents were terminated, and the Child was adopted by [Parents] on September 15, 2011. In addition to the Child, the [Parents'] home includes their two natural male children, J.M. age 14, and E.M. age 12; and a natural female child, E.I.M. age 10.
>
> The record is undeveloped concerning the Child's history with his natural parents; however, there is some indication that the Child suffered from nutritional and physical neglect. By all accounts, the Child has significant mental health concerns having been diagnosed throughout his life with, *inter alia*, oppositional defiance disorder, disruptive mood disorder, reactive attachment disorder, attention deficit/hyperactivity disorder, anxiety, and bipolar disorder.[1] During his life, the Child has been evaluated and treated by a variety of professionals including his family physicians, a psychiatrist, a psychologist, and numerous therapists. Although his treating psychiatrist, among others, recommended the Child for therapeutic residential treatment, the same was rejected by his insurance carrier and not further pursued by [Parents]. The outstanding question, which has not been credibly answered is unlikely to ever be known, is whether the Child's significant issues were precipitated by the six-month contact with his natural

_____

[1] With the agreement of the parties, the court separated the dependency proceedings from the finding of abuse. Parents initially appealed the adjudication of dependency; however, they later withdrew that appeal.

parents or, alternatively, by the Child's interaction with [Parents] while living in their home for approximately 13 years.

[1] The bipolar diagnosis has recently been determined to be medically inaccurate.

\*   \*   \*

On March 3, 2021, the Agency received the referral underlying the current litigation. The allegations included claims that the Child was underweight, was eating his own feces, and was being physically abused. An after-hours caseworker for the Agency responded to the home that same date. The caseworker was able to speak briefly with [Mother] but was refused access to either the Child or the home. Due to the exigency of the allegations, the Agency sought, and was granted, court permission to compel access to the Child. On March 4, 2021, Agency workers, accompanied by the Pennsylvania State Police, returned to [Parents'] home. After initial reluctance and some delay, [Mother] permitted law enforcement and Agency workers peaceful access to the Child and the home.

Upon entry to the home, Agency staff observed significant clutter and at least ten cats and dogs in the residence.[2] The bedrooms for all family members except the Child were on the heated upper level of the home; by contrast, the Child's bedroom was located in an unheated basement. Photographs of the other children's rooms depicted decorated living areas with age-appropriate toys and accompaniments. The Child's room, however, lacked decoration and was more consistent with a storage room. His room had two doorways, one that led to the remainder of the unfinished basement area and the second that led to a hallway and stairway, which is the sole access to the upper-level living area of the house. There was no bathroom or other known facilities in the basement as the sole bathroom in the residence was located on the upper-level heated portion of the house. On the inside of the doorway accessing the Child's bedroom was a hook and eyebolt latch located near the top of the door.[3] [Parents] incredibly claimed the purpose of the hook and latch was to permit airflow into the Child's room while keeping the cats

- 3 -

out of the room. [Parents'] explanation, however, accounts for neither the height location of the lock nor the need for the restriction on the Child's bedroom door as compared to restricting the animals' freedom at other locations in the house.

[2] Child has been medically diagnosed to be allergic to cats.

[3] From the photographs, it is conceivable that with some effort, the Child had the physical ability to unlatch the hook although it was located at a height higher than his short stature. Whether the Child was psychologically or emotionally capable of the same is unknown as evidence was presented at the hearing that corroborates the Agency's concern as to the [Parents'] psychological manipulation of the Child. As discussed above, [Parents'] explanation concerning the location of the latch was rejected by this [c]ourt as not credible.

The record also supports the existence of a similar lock at an elevated height on a door at the top of the stairway. The record neither credibly explains the reason for the lock on this second door being located at a height level that is difficult to access nor the need for the duplicative restrictions hampering access to the living portion of the home from the Child's bedroom.

Upon entering the home and interacting with the Child, the caseworker observed the Child to be approximately 4 feet, 6 inches tall and to weigh 78 pounds. The Child was wearing a diaper and appeared dirty. While speaking to the Child in the home, the Child provided inconsistent answers as to his eating habits and personal hygiene practices. Despite wearing a jacket, the caseworker noted that the Child's basement bedroom was too cold for the caseworker to remain there for any amount of time.

The Child's appearance prompted paramedics who had responded to the scene to seek a medical wellness assessment of the Child. [Parents] agreed, and the Child was taken to the Gettysburg Hospital Emergency Room.

While at the emergency room, the Child confirmed to his treating physician that he lived in a home with a lot of animals. He also confirmed he lived in the basement while other family members resided in the upper level of the home. He indicated he was not free to leave his room when he wanted because the door "was locked." The Child indicated he wears diapers because he is unable to "make it to the bathroom in time" because the doors are locked and he is unable to use the bathroom. He added that he is not permitted to use the bathroom alone because someone must be with him to make sure he does not make a mess on the walls. The Child further indicated that someone always supervises him while showering, and sometimes he has "mom time," which he described as taking a bath with [Mother]. Interestingly, the Child indicated he feels safe at home. Although the treating physician intended to discharge the Child, he concurred that removal of the Child from the custody of [Parents] was reasonable under the circumstances until further investigation could be made. The Child was taken into emergency shelter care following his discharge from Gettysburg Hospital.

While undergoing evaluation at Gettysburg Hospital, Agency staff consulted with Dr. Lori Frasier, Medical Director at UPMC Pinnacle Children's Resource Center and Professor of Pediatrics, Division Chief Child Abuse Pediatrics, at Penn State Hershey Medical Center. At Dr. Frasier's suggestion, the Child was taken to the Hershey Medical Center the following day for evaluation. [4] Upon presentation on March 5, 2021, the Child was admitted to the Center. At the time of his admission, he weighed approximately 79 pounds with the principal diagnosis being malnourishment in the setting of neglect. Due to his condition, he remained hospitalized through his discharge on March 8, 2021.

[4] Dr. Frasier expressed concern to the caseworker that the Child "might not make it through the weekend."

During the Child's stay at the Hershey Medical Center, Dr. Frasier and the child abuse team were consulted. Based upon her review of medical records and interaction with the Child, Dr. Frasier concluded the Child was the subject of physical, nutritional, and emotional neglect. She noted the

Child had grown normally through ten years of age but since had stagnated. Among factors influencing Dr. Frasier's opinion was her experience that the average 14-year-old was approximately 30 pounds heavier than the Child's current weight. She opined the Child was developmentally delayed and immature for his age. Despite the Child undergoing a host of medical studies while at the hospital, there was no discovered medical condition that would impact his normal growth and development. Dr. Frasier also revealed that a bone scan of the Child evidenced a non-displaced finger fracture on the left hand and an approximately one-year-old untreated fracture of the Child's left arm.

During Dr. Frasier's discussions with the Child, he confirmed that he lived in the basement, and his only access to others was through a "baby monitor." The Child advised that he wore a diaper and was required to ask for permission to go to the bathroom. He claimed to have been punished for "eating Cheerios" that were supposed to be fed to a rabbit in the residence. Dr. Frasier opined that the Child was coached not to disclose the abusive conditions in his home.[5] She described him using the word "time-out" as a means of punishment. When she inquired further as to what that meant, the Child described it as "gets beat" and being struck with a stick. Dr. Frasier observed that his statements were corroborated by his behavior as he would seek permission from nurses before using the bathroom. Interestingly, the Child was taken out of diapers at the hospital and displayed no issues with soiling himself. Medical records further confirm the Child had no difficulty digesting food as he was tolerating a 2,400 calorie per day diet without complications.

[5] Dr. Frasier believed any further immediate contact between the Child and [Parents] would be a "grave threat to him."

The Child was placed in foster care upon his release from Hershey Hospital. Although initially he suffered occasional incidents of soiling his underwear, he had not had such an issue in over two months at the time of the hearing. There was no concern about the Child using his waste excretions as a means to obtain attention. It was noted that he was

eating well while in foster care and in fact had gained approximately 12 pounds since his placement.

While under emergency shelter care of the Agency, the Child was evaluated by a trauma art therapist, Amanda Evans-Freet, at the Adams County Children's Advocacy Center. During the session, the therapist observed the Child re-creating his removal from [Parents'] home. He played out a reenactment in which he identified himself as a baby lion. He placed police cars and ambulances in the play area with two other toys that he identified as "bad parents" and used a play gun to shoot the "bad parents." He identified two other toys as his foster parents whose residence he liked due to its heat and air conditioning.

During the session, the Child indicated to the therapist he would be locked in his bedroom because he was "bad." He further acted out his not having food because other baby lions "needed it more." The therapist opined that the Child displayed evidence of coaching because he stated in response to questions that it was none of the therapist's business and that he can't talk about "bad parents." The Child confirmed that when he was punished with "time-out," he was hit with a paddle or a paint stick. Ms. Evans-Freet opined that the Child was very immature as, although being 14 years old, he acted like a seven-year-old.

In response to Agency evidence, [Parents] presented evidence of their attempt to obtain services for the Child as early as 2013. [Parents'] initial attempt was to obtain a family-based team from York/Adams Mental Health-IDD ("MH-IDD"). The effort was unsuccessful, however, as they could not acquire approval. In 2014, [Parents] attempted to obtain family driven funds from MH-IDD; however, they did not qualify for funding as it was only available to the "intellectually disabled." Later in 2014, [Parents] sought an intensive case manager from MH-IDD, but the process was closed due to lack of follow-through by [Parents] as they indicated they would seek services elsewhere. In 2017, an effort to obtain residential treatment for the Child was unsuccessful as the health insurance carrier indicated the Child did not meet criteria for insurance coverage. The recommendation to [Parents] for personal hospitalization was rejected. Additionally, a recommendation to [Parents]

for treatment by a provider in York County was rejected by them due to distance. The witness from MH-IDD indicated she had never met the Child but relied solely on [Mother] for information related to his alleged behaviors.

[Parents] also presented the testimony of psychologist Cheryl Walters who conducted a psychological evaluation of the Child in 2012. Based on her evaluation, she diagnosed the Child with reactive attachment disorder, attention deficit/hyperactivity disorder, and mood disorder not otherwise specified. The evaluation included observations, personal testing of the Child, and a behavioral history obtained solely from the adoptive mother.

Appellants also presented the testimony of the Child's treating psychiatrist, Dr. Earl Bernstine. Dr. Bernstine noted that his role as psychiatrist was medication management, and he did not provide psychotherapy to the Child. Although he claimed to begin working with the Child as early as 2013, Dr. Bernstine indicated he never interacted with the Child privately but rather had brief observations of him while [Mother] was present. Dr. Bernstine noted that he never observed behavior concerns in the Child but rather relied entirely on [Mother's] report regarding the Child's alleged history and conduct. The doctor opined he would never have recommended isolation for the Child.

[Parents] next called the Child's pediatrician as a witness. The pediatrician indicated that during annual physicals, he did not have any concern over the Child's height or weight; however, he recognized the Child's last exam was November 26, 2019 when, at age 12, the Child weighed 83 pounds. Despite his lack of concern over the Child's height and weight, the pediatrician acknowledged issuing a prescription for PediaSure "years ago." He noted the prescription ended when it was rejected by the insurance company based upon a medical review that failed to indicate any medical barrier to the Child's ability to consume and digest solid food. The pediatrician also acknowledged there was an ongoing prescription for diapers for the Child based upon a history provided by [Mother] rather than an independent medical examination. He further indicated he never witnessed any inappropriate behavior by the Child nor ever interacted with the Child unless [Mother] was present. The pediatrician

acknowledged he was personally unaware of the Child's living conditions.

[Parents] also called Dr. Steven Garland Gray, a clinical neuropsychologist, to discuss the illness of reactive attachment disorder. Dr. Gray noted the Child was not his patient, he had not evaluated either the Child or his treatment records, and he was not making a diagnosis regarding the Child. Dr. Gray opined as to the causes, symptoms, and potential treatment for reactive attachment disorder. During cross-examination, Dr. Gray confirmed that he would not recommend the isolation of a child who suffers from reactive attachment disorder. He further conceded that using fear tactics as a deterrent to behavior is not helpful in addressing the needs of a child suffering from reactive attachment disorder. Finally, Dr. Gray conceded that poor nutrition is not a common symptom for one suffering from reactive attachment disorder.

Finally, [Parents] testified as to the Child's history with them and their efforts to address their perceived concerns. They denied paddling the Child but acknowledged using "push-ups" as a punishment based upon information discovered during their self-education on reactive attachment disorder. Despite their belief that PediaSure was necessary to supplement the Child's nutrition, they acknowledged stopping the same once insurance refused to pay for it. [Parents] denied locking the Child in his room or forcing him to wear diapers. [M]other claimed that the Child was "wetting himself" at the age of three and began soiling himself "around nine years of age." [Parents] acknowledged the Child resided in his bedroom in an unheated basement and was subject to a rule that he could only leave his bedroom with another family member. They also acknowledged that despite the Child's allergy to cats, they permitted a dog, nine cats, a rabbit, and a rooster to reside within the home.

(Trial Court Opinion, 5/19/22, 1-8) (some footnotes omitted).

On January 10, 2022, the Agency filed a motion for a finding of abuse.

The Agency filed a motion for a finding of aggravated circumstances on

January 12, 2022. The court conducted a hearing on these motions on March 8, 2022.[2] On March 31, 2022, the court issued an order, docketed April 1, 2022, finding that Child had been the victim of abuse by both Parents. Specifically, the court found that Parents recklessly caused serious physical neglect of Child, and that their actions

> endangered the Child's health; threatened his well-being; and impaired his health, development, and functioning through failure to provide adequate essentials of life including food, shelter, or medical care and by a repeated, prolonged, and egregious failure to supervise the Child in a manner that is appropriate considering the Child's developmental age and abilities.

(Order, 3/31/22, at 1). On April 29, 2022, Parents filed a timely notice of appeal together with a statement of errors complained of on appeal.

Parents present the following issue for our review:

> Did the trial court abuse its discretion or [err] as a matter of law in determining that the Parents/Appellants are perpetrators of child abuse against T.I.M.?

(Parents' Brief at 4).

The applicable scope and standard of review for dependency cases is as follows:

___

[2] The hearing on March 8, 2021 was not transcribed. Generally, the failure to request a transcript for a hearing results in waiver of any claims that cannot be resolved in the absence of the necessary transcript. *See Commonwealth v. Preston*, 904 A.2d 1, 7 (Pa.Super.2006) (*en banc*), *appeal denied*, 591 Pa. 663, 916 A.2d 632 (2007) (citing Pa.R.A.P. 1911(a)). Here, however, the record is sufficient based on the evidence contained in the transcribed notes of testimony for the other hearings to review the trial court's finding of abuse. Accordingly, we do not find waiver.

[T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

*In re A.B.*, 63 A.3d 345, 349 (Pa.Super. 2013) (quoting *In re R.J.T.*, 608 Pa. 9, 26-27, 9 A.3d 1179, 1190 (2010)).

We accord great weight to this function of the hearing judge because [the court] is in the position to observe and rule upon the credibility of the witnesses and the parties who appear before [the court]. Relying upon [the court's] unique posture, we will not overrule [its] findings if they are supported by competent evidence.

*In re A.H.*, 763 A.2d 873, 875 (Pa.Super. 2000). *See also In re L.Z.*, 631 Pa. 343, 360, 111 A.3d 1164, 1174 (2015) (stating that standard of review in dependency cases requires appellate court to accept trial court's findings of fact and credibility determinations if record supports them, but appellate court is not required to accept trial court's inferences or conclusions of law). In addition, we have observed:

In dependency proceedings our scope of review is broad.... Although bound by the facts, we are not bound by the trial court's inferences, deductions, and conclusions therefrom; we must exercise our independent judgment in reviewing the court's determination, as opposed to its findings of fact, and must order whatever right and justice dictate.

*In re C.B.*, 861 A.2d 287, 294 (Pa.Super. 2004) (citation omitted), *appeal denied*, 582 Pa. 692, 871 A.2d 187 (2005).

Parents contend that the evidence introduced at the hearing does not support a finding of abuse. They claim that the court erred in relying on the

testimony of Dr. Frasier, whose testimony they claim was contradictory, and ignored the testimony of other medical experts who opined that Parents diligently strived to meet Child's unique needs. Specifically, parents claim that Child's weight and feeding issues were known by Child's treating physicians for years, and those professionals never alleged abuse by Parents. (Parents' Brief at 25-26). Parents assert that they obtained a prescription for PediaSure for Child and, after insurance denied the prescription, they asked for a referral to a nutritionist. (*Id.* at 26-27). Parents further argue that nothing in the record supports a finding that they withheld food from Child, and that the court erroneously relied on a single forensic interview to find otherwise. (*Id.* at 32-33).

Additionally, Parents claim that the trial court erred when it found that Child was a victim of abuse based on the location of his basement bedroom and the security arrangements for that room. Parents maintain that Child was not isolated in the basement; rather, Parents insist that location happened to be the location of his bedroom where he only spent time in the room while sleeping or resting. (*Id.* at 35-37). They contend that the lock on the door was to keep out cats, whereas the monitors were for Child's protection. Parents deny that Child was ever kept from using the bathroom.

Finally, Parents deny that they knowingly or recklessly failed to secure mental health services for Child. They explain that Child has unique and special needs stemming from early childhood trauma and contend that they

have constantly worked with Child's pediatrician and psychiatrist regarding these needs. (*Id.* at 41-42). We disagree.

Dependency proceedings are governed by the Juvenile Act,[3] which provides that a dependency petition may allege that there are "aggravated circumstances" relating to an allegedly dependent child. 42 Pa.C.S.A. § 6334(b). The Act defines "aggravated circumstances" as "[a]ny of the following circumstances":

> (1) The child is in the custody of a county agency and either:
>
> > (i) the identity or whereabouts of the parents is unknown and cannot be ascertained and the parent does not claim the child within three months of the date the child was taken into custody; or
> >
> > (ii) the identity or whereabouts of the parents is known and the parents have failed to maintain substantial and continuing contact with the child for a period of six months.
>
> (2) The child or another child of the parent has been the victim of physical abuse resulting in serious bodily injury, sexual violence or aggravated physical neglect by the parent.
>
> (3) The parent of the child has been convicted of any of the following offenses where the victim was a child: [list of offenses omitted].
>
> (4) The attempt, solicitation or conspiracy to commit any of the offenses set forth in paragraph (3).
>
> (5) The parental rights of the parent have been involuntarily terminated with respect to a child of the parent.

_____

[3] 42 Pa.C.S.A. §§ 6301-6475.

(6) The parent of the child is required to register as a sexual offender...or to register with a sexual offender registry in another jurisdiction or foreign country.

42 Pa.C.S.A. § 6302. Aggravated physical neglect is defined as "[a]ny omission in the care of a child which results in a life-threatening condition or seriously impairs the child's functioning." ***Id.***

Determinations regarding findings of child abuse are governed by the Child Protective Services Law (CPSL).[4] The CPSL defines "child abuse" to include "any recent act or failure to act" which causes bodily injury, "any act or failure to act" which causes or "substantially contribut[es] to serious mental injury to a child," "any recent act or failure to act" that creates a "reasonable likelihood of bodily injury to a child," "[c]ausing serious physical neglect of a child," and "unreasonably restraining or confining a child." 23 Pa.C.S.A. §§ 6303(b.1)(1), (3), (5), (7), (8)(ii). The CPSL defines serious physical neglect as follows:

> **"Serious physical neglect."** Any of the following when committed by a perpetrator that endangers a child's life or health, threatens a child's well-being, causes bodily injury or impairs a child's health, development or functioning:
>
> (1) A repeated, prolonged or egregious failure to supervise a child in a manner that is appropriate considering the child's developmental age and abilities.
>
> (2) The failure to provide a child with adequate essentials of life, including food, shelter or medical care.

---

[4] 23 Pa.C.S.A. §§ 6301-6387.

42 Pa.C.S.A. § 6303(a). A finding of child abuse must be established by clear and convincing evidence. *In re L.Z., supra* at 360, 111 A.3d at 1174.

Instantly, in addressing Parents' claim, the trial court reasoned:

> This [c]ourt's findings, as addressed above and supported by the evidence, clearly establish [Parents] engaged in conduct that intentionally, or at least recklessly, threatened the Child's well-being and impaired his health, development, and functioning through a repeated failure to provide adequate essentials of life including food, shelter, or medical care in a manner appropriate for his developmental age and abilities.
>
> Dr. Frasier credibly opined that the Child suffered nutritional and emotional abuse at the hands of [Parents]. Despite [Parents'] complaints of some discrepancy in the medical testimony of witnesses, Dr. Frasier was unwavering in expressing her opinion. Dr. Frasier's opinion is corroborated by undisputed evidence that the Child: (1) lived in semi-isolation from other family members in an unheated basement bedroom; (2) was significantly underweight for a child of equivalent age; (3) was required to wear diapers when there was no verifiable medical or psychological reason for the same; (4) was specifically advised against, and physically and emotionally deterred from, independently leaving the confines of his bedroom; and (5) suffers significant mental health issues which, as recognized by [Parents'] own expert, were likely compounded by his isolation.
>
> Dr. Frasier's opinion is supported by the credible testimony of trauma art therapist Amanda Evans-Freet, who opined that the Child's observed behavior suggested [Parents] neglected the Child in favor of their natural children. Specifically, Ms. Evans-Freet credibly described the Child's depiction of going hungry so other family members could be fed. She also expressed concern over the Child's physical treatment in [Parents'] home.
>
> The foregoing opinions are corroborated by the Child's consistent statements to various people. Those statements include allegations of being hit with a stick, being "locked"

- 15 -

in a bedroom, being forced to wear diapers, being punished for eating Cheerios intended for the animals, being isolated, and being required to ask permission before using the bathroom.

Although the Child has extraordinary needs, the record is replete with instances of [Parents'] repeated, prolonged, and egregious mistreatment of the Child in light of his developmental age and abilities. [Parents] responded to the Child's special needs by isolating the Child in an unheated basement room containing little, if any, age-appropriate decor or access to activities; placing him in diapers in lieu of access to bathroom facilities; subjecting him to discipline; and depriving him of sufficient nutritional intake.

[Parents'] claim throughout this litigation that they were repeatedly denied access to requested services is incredible and irrelevant to the finding of abuse. While there is no doubt as to the Child's extraordinary needs, the more pertinent focus is on [Parents'] response to those needs. It is true that [Parents] occasionally sought treatment alternatives during the years that the Child was under their care. Yet, there is a paucity of information in the record as to what treatment actually was provided and the success, if any, that resulted. Rather, the record paints a picture of recommendations never brought to conclusion as [Parents] faulted the alleged unavailability of services or the lack of insurance coverage for the same. For instance, throughout the litigation, [Parents] highlighted the insurance denial of payment for the nutritional supplement PediaSure. However, [Parents] were unable to explain why the $ 1,200 monthly adoption subsidy that they received for the adoption of the Child was insufficient to cover the cost of the supplement. Rather, they simply discontinued providing a health item they previously considered to be critical to the Child's well-being. [Parents'] attempt to deflect responsibility simply ignores the reality that [Parents] subjected the Child to terrible mistreatment.

(Trial Court Opinion at 9-11) (footnote omitted).

We agree with the trial court's analysis. Here, the Agency presented

clear and convincing evidence that Parents intentionally or at least recklessly

engaged in conduct that threatened Child's well being and impaired his health through repeated failures to provide the adequate essentials of life. ***See In re L.Z., supra***. Therefore, we conclude there was no abuse of discretion in the trial court's finding of child abuse by Parents' serious physical neglect of Child. ***See id.***; 23 Pa.C.S.A. § 6303. Parents' claim merits no relief. Accordingly, we affirm.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/2/2022